## NAWAL T. HADEED, ETC.

### V.

## MEDIC-24, LTD., ET AL.

Record No. 860505

March 3, 1989

Present: Carrico, C.J., Compton, Stephenson, Thomas, Whiting, and Lacy, JJ.,
and Poff, Senior Justice

*Lewis J. Paper (Charles B. Molster, III; Keck, Mahin & Cate,* on briefs), for appellant.

*Norman F. Slenker; Benjamin W. Glass, III; Gary A. Godard (Slenker, Brandt, Jennings & Johnston; Shevlin, Artz & Curtis; Godard & West,* on briefs), for appellees.

STEPHENSON, J., delivered the opinion of the Court.

When the jury was unable to agree upon a verdict in this medical malpractice case, the trial court struck the plaintiff's evidence and entered summary judgment for all defendants. The principal issue in this appeal is whether the trial court erred in striking the plaintiff's evidence.

## I

Nawal T. Hadeed (Nawal), personal representative of the estate of Teddy M. Hadeed (Hadeed), brought a wrongful death action against five defendants, Medic-24, Ltd. (Medic-24), a corporation; Frederick Kessler, M.D.; Rudolph Bickel, M.D.; Ronald Wilder, M.D.; and Ernest Rafey, M.D. (collectively, defendant-physicians). In her motion for judgment, Nawal alleged that each of the defendant-physicians "acted contrary to acceptable standards of medical care by wrongfully and negligently failing timely to diagnose coronary artery disease in . . . Hadeed, and to examine and treat him for [the] disease;" that because the defendant-physicians were agents of Medic-24, the negligence of the defendant-physicians was imputed to Medic-24; and that the negligence of all defendants proximately caused Hadeed's death. Each defendant denied liability, and the case was tried to a jury.[1]

---

[1] During the trial of this case, Nawal nonsuited Dr. Rafey.

Following a seven-day trial, the jury returned a verdict in favor of Dr. Bickel[2] but was unable to reach a verdict as to the defendants, Kessler, Wilder, and Medic-24. Thereafter, each of these defendants moved to have Nawal's evidence struck. The trial court granted the motion and entered summary judgment for the defendants. The court, however, denied Nawal's motion to strike Medic-24's evidence.

We granted Nawal an appeal limited to the following issues:

1. Whether the trial court, in considering the motions to strike at the conclusion of all the evidence, erred in failing to draw all reasonable inferences in favor of the non-moving party.

2. Whether the trial court erred in granting the defendants' motion to strike.

3. Whether the trial court erred in denying [Nawal's] motion to strike the evidence of [Medic-24].

## II

We first consider whether the trial court applied an incorrect standard in ruling on the defendants' motions to strike by failing to draw all reasonable inferences in favor of Nawal, the non-moving party. The standard we apply in reviewing a case in which the trial court has ruled on a motion to strike a plaintiff's evidence at the conclusion of all the evidence is set forth in *Matney* v. *Cedar Land Farms*, 216 Va. 932, 224 S.E.2d 162 (1976).

On review of a case in which the trial court has sustained a motion to strike after the introduction of all the evidence, we apply the principles governing consideration of evidence upon a motion to set aside a verdict as contrary to the evidence. "[W]e examine the evidence to determine whether or not a verdict in behalf of the losing party can be sustained. That is, upon a careful consideration of all the evidence, if we are of opinion that reasonable men may differ on the conclusion to be reached, then it is our duty to hold that the trial court committed error in striking the evidence." In viewing

[2] The trial court's judgment in favor of Dr. Bickel is not challenged in this appeal and that judgment has become final.

the evidence we give the plaintiffs "the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom."

*Id.* at 933-34, 224 S.E.2d at 163 (citations omitted) (quoting *Walton* v. *Walton*, 168 Va. 418, 422-23, 191 S.E. 768, 770 (1937)). The standard enunciated in *Matney* for appellate review also is the appropriate standard to be applied at the trial level.

It is clear from our reading of the record that the trial court, in passing on the defendants' motions to strike, misapplied the *Matney* standard of review by failing to view the evidence and all inferences fairly drawn therefrom in the light most favorable to Nawal. Consequently, we will state the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to Nawal.

## III

Hadeed was married to Nawal. He and his brother owned and operated a carpet shop in the City of Alexandria. Hadeed's work required him to do occasional heavy lifting. Hadeed was 50 years old when he died.

On the evening of April 5, 1981, Hadeed experienced strong chest pain and nausea. He also was sweating profusely and was so short of breath that he could not speak. After a few minutes, the pain and other symptoms disappeared.

Later that night (April 6), however, Hadeed experienced "the same pain all over again . . . the pain in the chest and shortness of breath." Consequently, he went to Medic-24. Medic-24 maintains medical offices 24 hours each day, providing general family medical services.

At Medic-24, Hadeed first spoke with a nurse. The nurse's notes reveal that Hadeed told her that he had "[c]hest pain across chest, both arms and back." The nurse took Hadeed's medical history which revealed that he had a family history of high blood pressure and heart disease. The nurse also took Hadeed's temperature, his pulse, and his blood pressure. His blood pressure was elevated.

Hadeed then saw Dr. Kessler. Dr. Kessler graduated from medical school in 1975, completed a one-year internship in 1976, and then completed a two-year residency in internal medicine. In 1979, he was "board-certified" in internal medicine.

Dr. Kessler's notes state that when he saw Hadeed on April 6, Hadeed's pain was "intermittent, sharp [and] increasingly associated with [shortness of breath]," and the pain "[b]egan in back & then went to chest. Some discomfort in both arms — [p]ain may last only 4-5 [minutes] & then disappears for a whole day." The doctor's chart, however, made no reference to the circumstances under which Hadeed had experienced the pain.

Dr. Kessler's examination of Hadeed included the doctor's review of an electrocardiogram (EKG). From the EKG, the doctor concluded that Hadeed had Left Ventricular Hypertrophy (LVH), which suggests long-standing hypertension that produces a thickening of the heart muscle and imposes greater strain on the heart in providing blood to the body. The EKG also suggested a possible malfunction of Hadeed's heart.

Dr. Kessler opined that the origin of Hadeed's pain was "noncardiac" and was "probably musculoskeletal," secondary "to lifting & wrestling." While he believed the pain was of a muscular origin, the doctor reported that Hadeed's chest and back were "non-tender." Dr. Kessler prescribed Tylenol No. 3 for Hadeed and sent him home. The doctor, however, did not inform Hadeed of the LVH diagnosis, did not arrange for further tests more fully to assess Hadeed's condition, and did not arrange to have Hadeed's cholesterol count taken.

Hadeed returned to Medic-24 twice in May 1981. The first time was early in the morning of May 3. The nurse on duty took Hadeed's pulse and blood pressure. Both were elevated.

Dr. Bickel, the physician on duty, read Hadeed's April 6 record and examined him. Hadeed complained of shortness of breath after vigorous work. Dr. Bickel noted that Hadeed had been using marijuana to alleviate tension at home. The doctor concluded that Hadeed had borderline hypertension. He prescribed muscle relaxants, recommended that Hadeed reduce the salt in his diet, advised him to stop using marijuana, and told him to return to Medic-24 in one to two weeks. Dr. Bickel, however, did not tell Hadeed that he had LVH.

Hadeed next visited Medic-24 in the early evening of May 15 and again was seen by Dr. Bickel. Hadeed's blood pressure was reduced, but he still complained of shortness of breath. He also complained of pain in his neck and shoulders. Dr. Bickel, still of opinion that Hadeed was suffering from hypertension, prescribed medication to reduce Hadeed's blood pressure.

On December 17, 1981, Hadeed experienced "a horrible pain" in his chest when he tried to lift a rug for a customer.[3] He also was nauseous, dizzy, and short of breath. That evening, Hadeed again visited Medic-24. He told the nurse that his problem was back pain and shortness of breath.

This time, Hadeed was seen by Dr. Wilder. The doctor reviewed Hadeed's charts from previous visits to Medic-24 and gave Hadeed a physical examination. As shown by the chart Dr. Wilder prepared, Hadeed's subjective complaints on this occasion were the "[s]ame problems as before — see previous visits." Dr. Wilder concluded that Hadeed was suffering from a muscle disorder called "fibromyalgia."

On December 24, 1981, Hadeed was engaged in work. In the early afternoon, after having parked his truck in a shopping center, Hadeed suffered a fatal heart attack.

An autopsy revealed that Hadeed had severe coronary artery disease. This disease, commonly known as hardening of the arteries, reflects a condition where fatty tissue builds up inside the arteries and blocks the flow of blood from the arteries to the heart. The autopsy also showed that Hadeed had myocardial scarring, which indicated that he had suffered another heart attack sometime prior to his death.

Hadeed's left anterior descending artery was blocked 100 percent. His right artery, which was predominant in Hadeed's coronary system, was blocked 80 percent. A third artery, the circumflex artery, was very small and provided little distribution of blood to Hadeed's heart.

According to the medical examiner who performed the autopsy, Hadeed's death was caused by "hardening of the blood vessel of the coronary artery with resultant insufficient blood flow to the heart." The medical examiner testified that "in common terms [Hadeed] had a heart attack and died rather quickly."

Expert evidence revealed the nature, symptoms, and diagnosis of coronary artery disease as well as the risk factors in assessing the likelihood that a person has the disease. The experts agreed that when a middle-aged male comes to a physician with chest pain, the physician's first concern is to either rule "in or out" the possibility that the patient has coronary artery disease.

[3] The evidence reveals that, between April 6, 1981, and December 17, 1981, Hadeed had experienced chest pain on at least three other occasions.

Testimony indicated that angina probably is the most common symptom of coronary artery disease. Angina refers to pain that is produced when the heart cannot receive sufficient blood due to arteries that are clogged by fatty tissue. A common sign of angina is chest pain. Most often, the pain is described as a tightness, but the pain also can be sharp. The pain may be in other parts of the upper body, including the neck, the shoulders, the back, and the arms. Generally, the pain lasts for only a few minutes. Sweating, nausea, and shortness of breath are other symptoms associated with angina.

Usually, the pain is induced by an external force, *e.g.*, exertion, eating, emotional anxiety, and exposure to cold. Rest usually alleviates the pain. The frequency of angina attacks can vary greatly, from "once every couple months to many times in one day."

Angina is diagnosed on the basis of a patient's medical history. The history can reveal certain "risk factors" that increase the likelihood of a person's contracting coronary artery disease. For example, males between the ages of 35 and 55 represent the most vulnerable group, and cigarette smoking can increase the risk of contracting the disease. High blood pressure and high cholesterol also can increase the risk. If a person's parents or other close blood relatives have had the disease at an early age, the likelihood of that person's contracting the disease is increased. In considering complaints of pain, therefore, a physician should take these risk factors into account.

From a patient's medical history, a physician should ascertain the location and duration of the pain and the circumstances under which the pain is experienced. In order to obtain an accurate and complete medical history, the applicable standard of care requires a physician to ask probing questions of the patient.

Dr. George Rebecca, a cardiologist, was one of Nawal's medical experts. He testified that, based upon Hadeed's history and Dr. Kessler's examination of Hadeed, Dr. Kessler's treatment fell below the standard of care in failing to diagnose Hadeed's pain as angina and in failing to refer Hadeed to a cardiologist or to a hospital for treatment. Had Hadeed been referred to a cardiologist or to a hospital, his heart condition could have been diagnosed and appropriate treatment would have followed. The treatment might have been in the form of medication, or if Hadeed were in a critical state, in the form of bypass surgery.

According to Dr. Rebecca, treatment would have improved Hadeed's chance of survival:

> Without treatment at all the chances for mortality rate . . . would be around 10 to 15 percent per year. In other words, each year that he lived he would have a 10 to 15 percent chance of dying. If treatment had been initiated, that would have been reduced to 4 or 5 percent.

Dr. Dennis Donahue, also a cardiologist, was Nawal's other medical expert. He also testified that Dr. Kessler's treatment of Hadeed fell below the standard of care in failing to diagnose angina on April 6, 1981, and in failing to refer Hadeed for treatment. Dr. Donahue testified that, had Hadeed been so referred, a cardiologist would have found that Hadeed had severe coronary artery disease. The witness also stated that if Hadeed had had bypass surgery in April 1981, Hadeed would have had an 85 to 90 percent chance of living to age 70. If Hadeed had been placed on medical therapy, he would have had a 50 percent chance of living to age 60.

Similarly, Drs. Rebecca and Donahue testified that Dr. Wilder's treatment of Hadeed fell below the applicable standard of care. Based upon Hadeed's records at Medic-24 and his symptoms on December 17, 1981, they testified that Dr. Wilder fell below the applicable standard of care in failing to diagnose angina and in failing to refer Hadeed for treatment. Had Hadeed received bypass surgery at that time, he would have had an 85 to 90 percent chance of surviving to age 70. With medical therapy, Hadeed would have had a "[f]orty to 50 percent chance of being alive at 10 years."

## IV

We next consider whether the trial court erred in striking Nawal's evidence. Ordinarily, negligence and proximate cause are issues for a jury's resolution. A court decides these issues only when reasonable minds could not differ. *Griffin* v. *Shively*, 227 Va. 317, 320, 315 S.E.2d 210, 212 (1984). Moreover, as previously noted, when the sufficiency of a plaintiff's evidence is challenged by a motion to strike at the conclusion of all the evidence, the trial court must give the plaintiff "the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn

therefrom." *Walton*, 168 Va. at 423, 191 S.E. at 770. These principles of tort litigation apply "with no less force to medical malpractice cases." *Brown* v. *Koulizakis*, 229 Va. 524, 531, 331 S.E.2d 440, 445 (1985).

In *Brown*, we discussed negligence and proximate cause in the context of a medical malpractice death case.

> A physician is not an insurer of the success of his diagnosis and treatment nor is he held to the highest degree of care known to his profession. The mere fact that he has failed to effect a cure or that his diagnosis and treatment have been detrimental to the patient's health does not raise a presumption of negligence. Nevertheless, a physician must demonstrate that degree of skill and diligence in the diagnosis and treatment of the patient employed by a reasonably prudent practitioner in his field of practice or specialty.
>
> In medical malpractice cases, as in other negligence actions, the plaintiff must establish not only that the defendant violated the applicable standard of care, and was therefore negligent, he must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death. Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing the death.

*Id.* at 532, 331 S.E.2d at 445-46 (citations omitted). *Accord Whitfield* v. *Whittaker Mem. Hospital*, 210 Va. 176, 183-84, 169 S.E.2d 563, 568-69 (1969).

Clearly, Nawal presented sufficient evidence of negligence against both Dr. Kessler and Dr. Wilder to create jury issues. The record contains evidence that both physicians fell below the applicable standard of care in failing properly to diagnose angina and in failing to refer Hadeed to a cardiologist or to a hospital for appropriate treatment.

Likewise, proximate cause was a jury question. Nawal presented evidence that the doctors' failure to meet the applicable standard of care destroyed any substantial possibility of Hadeed's

survival. A jury reasonably could find that with bypass surgery Hadeed would have had an 85-90 percent chance of living to age 70. With only medical therapy, he would have had a 50 percent chance of living to age 60.

Dr. Kessler argues that his negligence could not have been a proximate cause of Hadeed's death because Hadeed was "nowhere near the 'threshold of death' " when he was examined on April 6, 1981. A jury reasonably could have been persuaded by this argument, but from the evidence and its fair inferences, a jury also reasonably could have found that Dr. Kessler's negligence proximately caused Hadeed's death. The evidence indicates that Hadeed had severe coronary artery disease in April 1981 and that, had he received the proper treatment at that time, he would have had a substantial possibility of surviving.

Paradoxically, Dr. Wilder argues that his negligence could not have proximately caused Hadeed's death because there was insufficient time between Hadeed's visit on December 17, 1981, and his death on December 24, 1981, for either bypass surgery or medical therapy. This argument also might have been made to a jury, but again, applying the correct standard for viewing the evidence on a motion to strike, we conclude that reasonable minds could differ. Thus, whether Dr. Wilder's alleged negligence proximately caused Hadeed's death is a question of fact for a jury.

## V

The final issue is whether the trial court erred in denying Nawal's motion to strike Medic-24's evidence. Nawal contends that Drs. Kessler and Wilder were employees of Medic-24 and the evidence, as a matter of law, establishes a master and servant relationship. Medic-24 contends, on the other hand, that a jury reasonably could find from the evidence that the doctors were independent contractors.

Medic-24 is operated by Dr. Rafey. Through Dr. Rafey, it hires other physicians. Some physicians work full-time; others work part-time. Drs. Kessler and Wilder worked part-time.

Dr. Rafey informed all of Medic-24's physicians that he expected them to practice medicine according to his standards because they were "seeing [his] patients when [he was] not there." Medic-24 had the power to dismiss at any time any physician who did not follow Dr. Rafey's instructions or conform to his stan-

dards. Indeed, on one occasion, Dr. Rafey fired a doctor who refused to treat children.

■ Generally, whether a person is a servant or an independent contractor is a question of fact for a properly instructed jury. When, however, the evidence admits of but one conclusion, the question is one of law. *See Drake* v. *Livesay*, 231 Va. 117, 121, · 341 S.E.2d 186, 188-89 (1986); *Naccash* v. *Burger*, 223 Va. 406, 417-19, 290 S.E.2d 825, 831-33 (1982); *Stagg* v. *Taylor*, 119 Va. 266, 270, 89 S.E. 237, 238 (1916).

■ The elements to be considered in determining whether a master and servant relationship exists are well established.

> Four factors enter into determination of the question whether a master-servant relationship exists within the contemplation of the doctrine of respondeat superior, (1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative.

*Naccash*, 223 Va. at 418-19, 290 S.E.2d at 832. *Accord Stover* v. *Ratliff*, 221 Va. 509, 511-12, 272 S.E.2d 40, 42 (1980); *Baker* v. *Nussman*, 152 Va. 293, 303, 147 S.E. 246, 249 (1929).

In the present case, the undisputed evidence shows that (1) Medic-24, through its principal, Dr. Rafey, hired the doctors to take care of Dr. Rafey's patients in his absence; (2) Medic-24 paid the doctors for their services; and (3) Medic-24 had the power of dismissal. We cannot say, however, that with respect to the fourth and determinative element, *i.e.*, the power of control, the evidence is conclusive. Indeed, as Medic-24 asserts, the doctors were expected to exercise their independent judgment and discretion in the treatment of patients. *See, e.g., James* v. *Jane*, 221 Va. 43, 54, 282 S.E.2d 864, 870 (1980) (in sovereign immunity context, state hospital exercised slight control over its physicians).

■ We hold, therefore, that whether the doctors were employees of Medic-24 or independent contractors were factual questions for resolution by a properly instructed jury. Consequently, the trial court did not err in denying Nawal's motion to strike Medic-24's evidence.

## VI

In sum, we hold that the trial court erred (1) in applying the incorrect standard in ruling on the defendant's motion to strike Nawal's evidence, and (2) in striking Nawal's evidence. We further hold that the trial court properly denied Nawal's motion to strike Medic-24's evidence.

Accordingly, we will reverse the trial court's judgment and remand the case for a new trial consistent with the views expressed herein.

*Reversed and remanded.*