Garrett J. KLEIN, et al., Plaintiffs,

v.

Robert J. BOYLE, et al., Defendants.

Civ. A. No. 90–0044–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 24, 1991.

Edward L. Hogshire, Buck & Hogshire, Charlottesville, Va., James P. Davenport and Robert J. Dodge, Nussbaum & Wald, Washington, D.C., for plaintiffs.

Tara M. McCarthy, Slenker, Brandt, Jennings & Johnston, Merrifield, Va., Michael P. Curreri and Linda B. Georgiadis, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This matter comes before the court on two motions: (i) the defendants' motion for summary judgment; and (ii) the plaintiffs' motion for a continuance. For the reasons stated below, the court grants the motion for summary judgment with respect to defendant Brian Conway, M.D., and also grants the plaintiffs' motion for a continuance.

## BACKGROUND

This is a medical malpractice action brought by Anita and Steven Klein on behalf of their son Garrett.[1] Garrett was born 15 weeks premature at the University of Virginia Medical Center ("Medical Center") on January 31, 1988. Garrett was immediately transferred to the Medical Center's Neonatal Intensive Care Unit ("NICU") to be monitored and treated for complications brought on by his premature birth. While in the NICU he received nearly two months of continuous oxygen therapy.

Premature infants who receive prolonged oxygen therapy are at special risk of developing an ophthalmological disorder known as retinopathy of prematurity[2] ("ROP"). If it is untreated, ROP can progress to retinal detachment and blindness.

Garrett's medical chart suggests that a NICU intern, Dr. Spruill, ordered an eye examination for Garrett on March 18, 1988. Dr. Lyon, an ophthalmology resident, performed the examination and prepared a consult report. This report indicated that Garrett's eyes were normal. The report also indicates that the infant examined by Dr. Lyon was a full-term baby who had been on oxygen therapy for more than 48 hours.[3] However, the report did not recommend that Garrett be given any follow-up examinations.

Garrett remained a NICU patient until May 10, 1988. He did not receive any further eye examinations. He was seen in the Medical Center's Neonatal Follow-up Clinic on June 14, 1988, at which time his retinas appeared to be at least partially attached. On July 26, 1988 Garrett was found to have Grade V ROP with total bilateral retinal detachment.

Plaintiffs allege that had Garrett been given a follow-up examination (or an initial examination for that matter), his developing ROP would have been discovered in time to afford him the opportunity of "cryotherapy" or "freeze treatment."[4]

---

1. The following facts are taken in the light most favorable to the plaintiffs.

2. ROP is a disorder in the development of the blood vessels of the retina. In premature infants whose vessels have not completely formed, normal vascularization is often disrupted, vessels over-proliferate and then die, and the resulting scar tissue can cause retinal detachment.

3. Plaintiffs allege that Garrett was never examined, but that his name was nonetheless erroneously placed on the consult report.

4. On March 29, 1988 (six days after Garrett's purported eye examination), researchers held a press conference announcing that cryotherapy reduced the risk of severe visual loss by one-half in 172 babies with advanced ROP (On July 26, 1988 Garrett's ROP had advanced beyond the stage of effective cryotherapy).

A brief discussion of the hierarchy within the NICU is necessary to place the plaintiffs' claims into the proper perspective. Patients in the NICU are assessed each morning by the "house physicians"; i.e. interns, residents and fellows. Interns are expected to examine the patients on a daily basis and write orders for that patient. Residents are the primary supervisors for the interns, and are responsible for being on call with the interns to help with questions and any procedures. The resident gets guidance from the fellow, a physician with two additional years of experience in neonatology. At the top of the ladder are the attending or faculty physicians. All of the defendants, with the exception of Dr. Conway, are attending physicians in the NICU. Dr. Conway is a faculty member and Chairman of the Ophthalmology Department.

Patients in the NICU are assessed each morning by an intern, resident and fellow who make what are known as "work rounds." During these rounds the house staff develops a course of treatment for the individual patients. Later in the morning the attending physicians conduct another set of rounds (called ARF rounds) with the senior resident and fellow in charge of the house staff. During these rounds the senior resident presents each patient's medical history and a proposed treatment plan. Although the resident is primarily responsible for developing the treatment plan, the attending physician has the ultimate authority to override any decision by the house staff.

Doctors Darnell, Kattwinkel and Boyle's only contact with Garrett Klein occurred during the "ARF rounds," when they signed off on his medical chart. These doctors relied on the consult report prepared by Dr. Lyon which indicated that Garrett's eyes were normal. Dr. Conway is the Chairman of the Department of Ophthalmology at the Medical Center and had no direct contact with Garrett Klein during Garrett's stay in the NICU. His only connection with the case is that a resident in his department prepared the consult report on Garrett.

## I.

The defendants' motion for summary judgment is premised on three separate grounds. First, they claim the protection of sovereign immunity for acts of simple negligence. Second, the defendants argue that the plaintiffs' medical experts cannot point to a violation of the standard of care for medical professionals in the Commonwealth. Lastly, the defendants assert that any negligence on their part was not the proximate cause of the plaintiffs' injuries.

### A. Sovereign Immunity

The parties agree the cloak of sovereign immunity is "alive and well" in Virginia. See e.g. Colby v. Boyden, 241 Va. 125, 400 S.E.2d 184 (1991) (extending sovereign immunity to police officer who injured plaintiff while engaged in the enforcement of traffic laws); Gargiulo v. Ohar, 239 Va. 209, 387 S.E.2d 787 (1990) (extending immunity to board certified, fully licensed physicians employed as a research fellow in training). The dispute lies in whether the cloak is large enough to encompass all of the defendants.

The Supreme Court of Virginia employs a four part test in analyzing claims of sovereign immunity. See James v. Jane, 221 Va. 43, 282 S.E.2d 864 (1980). Specifically, a court addressing the immunity issue should consider:

1. the nature of the function performed by the employee;

2. the extent of the state's interest and involvement in the function;

3. the degree of control and direction exercised by the state over the employee; and

4. whether the act complained of involved the use of judgment and discretion.

Messina v. Burden, 228 Va. 301, 313, 321 S.E.2d 657 (1984).

The defendants assert they only dealt with Garrett Klein in their capacity as teachers; i.e. during the ARF rounds. The defendants also stress the state has a

strong interest in educating and training physicians.

■ The plaintiffs argue persuasively that this case is indistinguishable from *James, supra.* In *James,* the Supreme Court of Virginia held that sovereign immunity did not extend to attending faculty members at the Medical Center. Commenting on the status of faculty members at the Medical Center, the court stated:

He (the faculty physician) will teach, and he will also attend patients, usually in the presence of and assisted by students, interns, and residents in the University Hospital. The University provides the administration staff, the physical facilities, operating rooms, interns, and residents in the University Hospital. It places him in a hospital where numerous patients come for medical and surgical attention with the knowledge that the physician will see and attend both private and staff patients. Implicit in this arrangement is the understanding that the physician will use reasonable care in the performance of his duties as such an attending physician.

*Id.* 221 Va. at 50, 282 S.E.2d 864.

The defendants attempt to distinguish themselves from the physicians in *James* by stressing they did not perform the ROP examination. The fatal flaw in the defendants' argument is it presupposes that supervision of interns and residents relates solely to a teaching, as opposed to a healing, function. Faculty members at the Medical Center serve dual purposes; they teach and they care for patients. The fact that this care is provided by virtue of the supervision of junior physicians is of no import with respect to the immunity issue.[5] So long as the faculty physician undertakes to care for a patient (whether directly ad-

ministering the care or delegating that responsibility to others), the state has little interest in immunizing the faculty from liability for his own negligent conduct.[6]

■ The foregoing analysis applies only to Doctors Boyle, Kattwinkel and Darnell. Dr. Conway stands on a different footing. The plaintiffs contend that Dr. Conway established a patient-physician relationship with Garrett by virtue of his responsibility, as the director of ophthalmology services, to respond to all consultation requests directed to his service. The plaintiffs claim Dr. Conway was negligent by allowing Dr. Lyon, an ophthalmology resident, to conduct the consult report on Garrett.

Although the plaintiffs' claim against Dr. Conway could be characterized as a claim of negligent supervision, the court finds it closer to a claim of negligent teaching. Dr. Conway never established, during the relevant period, a patient-physician relationship with Garrett Klein. Dr. Conway never examined Garrett while he was in the NICU. The fact Dr. Conway was ultimately responsible for all ophthalmology patients does not and cannot mean that Dr. Conway undertook an obligation to treat every patient in the Medical Center who needed ophthalmology services. As head of his department, Dr. Conway performs an administrative and teaching function. In these matters, the state has a strong interest in extending immunity to its employee. Accordingly, the court grants Dr. Conway's motion for summary judgment on the grounds that Dr. Conway is immune from suit in this particular instance.

## B. *The Standard of Care Argument*

The thrust of the defendants' argument is that the plaintiffs' experts are unqual-

---

5. The defendants make a strong argument they are not negligent by relying on the consult report prepared by Dr. Lyon. However, this argument is more properly addressed to a jury with respect to the issue of negligence.

6. When Garrett was admitted to the NICU, the Kleins were given a "Newborn Intensive Care Unit Parents Information Booklet" which states, "[t]he University of Virginia has a highly specialized Newborn ICU staff. We presently have four Neonatology Attendings, two Neonatology

Fellows and a staff of rotating Pediatric Resident Physicians. One of the Pediatric Residents will be your baby's primary doctor, for a month at a time. Other Residents will substitute for your baby's primary Resident on weekends and at nights. *The Attending physician will see your child daily, and advise the primary Resident regarding your child's daily care."* (emphasis added). The clear implication of this pamphlet is that the Attending Physician will care for children in the NICU.

ified to testify as to the standard of care for medical professionals in the Commonwealth of Virginia. By standard of care, defendants mean the practice of Virginia hospitals regarding the assignment of residents and their degree of supervision. The plaintiffs' own experts admit they are not aware of the residency programs at other Virginia hospitals.

The plaintiffs contend the standard of care pertinent to this case does not involve the use of residents in patient care, but instead focuses on the necessity and timing of ROP examinations in high risk infants. The plaintiffs also argue there is no evidence suggesting these nationwide standards vary for physicians within the Commonwealth.

The flaw in the defendants' argument is that it misconstrues the extent of the plaintiffs' claims of negligence. The plaintiffs allege, inter alia, that the defendants were negligent by failing properly to evaluate the ROP consult *and* for failing to order further ROP exams. For the court to grant the defendants' motion on this issue, it would have to determine that a ROP follow-up exam was unnecessary in this instance. The plaintiffs allege that failure to order a follow-up exam is negligence. The defendants disagree. This dispute is a singularly appropriate matter for a jury to resolve after testimony by the expert witnesses. Accordingly, the defendants' motion for summary judgment is denied to the extent it is based on the standard of care argument.

## C. *The Proximate Cause Argument*

■ The defendants' basic argument is that even if Garrett was misdiagnosed, the plaintiffs must still prove: (i) the Kleins would have used cryotherapy; and (ii) the therapy would have been successful.

In contrast, the plaintiffs contend that under Virginia law, they need only prove that it is more probable than not that the defendants' negligent action or inaction has effectively terminated a significant possibility that the plaintiff will benefit from therapy. The plaintiffs rely heavily on *Brown v. Koulizakis,* 229 Va. 524, 331

S.E.2d 440 (1985); and *Hadeed v. Medic–24, Ltd.,* 237 Va. 277, 377 S.E.2d 589 (1989). In *Hadeed,* the plaintiffs contended the defendants' negligent failure to diagnose a 50 year-old patient's coronary artery disease was a proximate cause of his death. Plaintiffs' experts testified that if the decedent had been treated by medication or bypass surgery, his risk of death would have decreased from 10–15% per year to 4–5% per year. The court found this evidence sufficient to submit the issue of causation to the jury.

> ... [I]f a defendant physician, by action or inaction, has destroyed *any substantial possibility* of the patient's survival, such conduct becomes the proximate cause of the patient's death. The law does not require the plaintiff to prove to a certainty that the patient would have lived had he received more prompt diagnosis and treatment for the condition causing his death.

*Id.* 377 S.E.2d at 594–94.

In short, the plaintiffs' claim that where it is probable the defendant's negligence has foreclosed "any substantial possibility" of preventing plaintiff's injury, the defendant is liable in damages for the loss of that opportunity to obtain treatment.

The defendants take a more restricted position, asserting that the "any substantial possibility" test applies only in wrongful death actions. Instead, they argue that to establish proximate cause the plaintiff must prove that "but for" the misdiagnosis, Garrett Klein would have recovered. The defendants contend that the plaintiffs have failed to clear this hurdle because "... there would be a 70 to 80% chance of failure of the operation anatomically." *Defendants' Motion for Summary Judgment* at 7.

At this juncture, it is unnecessary for the court to resolve the legal disputes between the parties. This is because even if the court uses the defendants' proposed "but for" standard, it cannot be said that the plaintiffs have failed to meet their burden of establishing proximate cause. The plaintiffs contend that cryotherapy reduces the incidence of unfavorable visual out-

comes (i.e. physiological outcomes associated with blindness) by 40% to 53% in each eye that receives the procedure. *Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment* at 41. They further argue that if Garrett had been given cryotherapy in both eyes, there would be at least a 64% chance that he would have some vision in one of his eyes.

The court is of course cognizant of the defendants' claims that cryotherapy was and is experimental and that it should not be used in both eyes. However, the court need not resolve these conflicting issues of material fact on a motion for summary judgment. The very existence of these conflicts indicates that summary judgment is inappropriate. Accordingly, the court denies the defendants' motion for summary judgment to the extent it is based on a proximate cause argument.

## II.

The next matter for this court to resolve is the plaintiffs' motion for a continuance. The plaintiffs take the position that discovery and trial preparations indicate that their prior estimate of three days to try this case was simply inadequate. The parties have identified 16 fact and eight expert witness, leaving out those fact witnesses to be called by both sides. The plaintiffs ask that the court set aside ten days for the trial of this matter.

The oral argument on these motions indicates quite clearly to this court that three days is simply not enough time for the trial of this matter. Therefore the court will grant the plaintiffs' motion for a continuance.

## III.

In summary, the court grants the defendants' motion for summary judgment with respect to defendant Brian Conway, M.D. Further, the trial date for this matter is continued until such time as is convenient for both the court and trial counsel.