Present:  Lacy, Hassell, Keenan, Koontz, Kinser, and Lemons, JJ., and Whiting, S.J.

KACIE HOWERTON, AN INFANT, ET AL.          OPINION BY
                                 SENIOR JUSTICE HENRY H. WHITING
v.  Record No. 011557                 June 7, 2002

MARY IMMACULATE HOSPITAL, INC.

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
H. Vincent Conway, Jr., Judge

In this medical malpractice action, we review the trial court's ruling in striking the plaintiffs' evidence on the ground that it was insufficient as a matter of law to establish either that the defendant was negligent or that such alleged negligence was the proximate cause of the damages claimed. Because the trial court struck the plaintiffs' evidence, we state the evidence in the light most favorable to the plaintiffs.  E.g., Hadeed v. Medic-24, Ltd., 237 Va. 277, 281, 377 S.E.2d 589, 590 (1989) (court struck evidence after jury failed to agree upon a verdict).

On March 27, 1997, Lora Howerton, the only patient in the labor and delivery rooms of the Mary Immaculate Hospital, was awaiting the birth of her first child, later named Kacie Howerton.  A number of relatives were in the room with the expectant mother.

That morning, at the direction of Dr. Kathy O'Connell, Mrs. Howerton's obstetrician/gynecologist, labor and delivery nurses employed by the hospital administered Pitocin, a drug designed

to induce labor.  When Dr. O'Connell examined Mrs. Howerton at 2:25 p.m., Dr. O'Connell thought that the frequency of her contractions and the dilation of her cervix indicated Mrs. Howerton was in the early stages of labor.  Dr. O'Connell directed that the Pitocin be continued and she did not expect the mother's cervix to be sufficiently dilated for delivery of the baby for some time.  Although Dr. O'Connell left the hospital, she was available to be contacted through the hospital paging system.

At 2:30 p.m. Mrs. Howerton was experiencing more intense contractions than she had that morning but the resulting pains were broad in nature, rather than in one particular spot, and the pains were not excruciating.  However, at 3:00 p.m., Mrs. Howerton testified that she experienced intense and different abdominal pains as if "someone had taken a knife and stuck it directly in me at that spot and twisted it."  Mrs. Howerton asked one of her relatives to get a nurse so that she could tell the nurse of the new and "totally different" pain.

Whereupon, Howard Linwood Howerton, her husband, went to the nurses' station adjoining Mrs. Howerton's labor room and told the nurses that his wife was "in severe pain.  We need somebody to come in here now . . . she feels it's not normal."  The response was: "It will be a few minutes.  We're in the middle of shift change."  Later, when Mrs. Howerton's mother

went to the nurses' station and stated that "My daughter needs you now . . . she's having sharp pains," she received the same response.  Two of the nurses finally came to the room at 3:15 p.m. after Mrs. Howerton's father, using strong language, demanded that they do so.

The husband testified that when the nurses "came in the room and realized that something was going on . . . [one nurse] yelled, 'Stat.' "  "Stat" is a code word which signifies an emergency situation.

There was a further delay in contacting the doctor because the one nurse suggested they not call the doctor "yet."  Some time later, at 3:23 p.m., another nurse, who disagreed with the first nurse, paged Dr. O'Connell on the doctor's cellular telephone using the "stat" designation of an emergency situation.  At that time, Dr. O'Connell was in her car some distance away from the hospital.

When the doctor answered the emergency page at 3:25 p.m., she was advised that the undelivered baby's heart rate was in the "60s to 70s" (a normal heart rate being from 120 to 160) and that the mother was having some abdominal pain.  Dr. O'Connell learned that the infant's heart rate "had been down for a while, but [did not] recall exactly how many minutes at that point."

As Dr. O'Connell was driving rapidly toward the hospital, she called the labor room again at 3:30 p.m. and learned that

the baby's heart rate was "still low in the 60s to 70s." At that time "we started talking about moving her back to the operating room for a C-section." The doctor described a Caesarian section or C-section as "the most expeditious way to deliver a baby in an emergency situation." Dr. O'Connell testified that if a reasonably prudent obstetrician/gynecologist is informed that "a patient was experiencing sudden pain that was out of the ordinary and there were some decelerations of the heart rate, one may start to think about a C-section."

Dr. O'Connell was able to deliver Kacie Howerton by C-section at 3:55 p.m., promptly after her arrival, because she had alerted the hospital to set up the C-section as she was driving toward the hospital. After Kacie's delivery, it was discovered that the mother's uterus had ruptured in three places during labor resulting in extensive neurological damage to Kacie.

Georgia Holder, a nurse with extensive experience in labor and delivery nursing, qualified as an expert witness on the standard of care required of labor and delivery nurses. In Nurse Holder's opinion, this standard of care required one of the labor and delivery room nurses immediately to have gone to Mrs. Howerton when "notified of this worsening pain," evaluate her condition, and notify her physician.

4

Dr. Robert Juskevitch, an obstetrician/gynecologist, also testified as an expert witness. Dr. Juskevitch stated that an expectant mother's complaints of pain of a different type and character and intensity than labor pains prior to delivery of the baby "could [indicate] a ruptured uterus, also could be a separation of placenta." Hence, in the performance of the requisite standard of care, a reasonably prudent physician should immediately go to the mother's bedside and be prepared to perform any necessary C-section within 30 minutes of being informed of such complaints.

Dr. Juskevitch also testified that Mrs. Howerton's complaints of a new and different deep, sharp, and knife-like pain indicated that there was "a rupture [or tearing of the uterus] that occurred at 3:00 [p.m.], and in general, things like this tend to be progressive." "It might start out as a small tear and extend, become larger, over time." Dr. Juskevitch opined that these knife-like instances of pain were associated with episodes of increased tearing.

Dr. Juskevitch explained that these instances of tearing presented challenges to the unborn baby which began when the first tear occurred at 3:00 p.m., and were evident at 3:17 p.m. when "the nurses came into the room, realized that the baby's heart rate was erratic." However, if these partial and progressive tears had not ruptured the blood vessels from which

5

the unborn baby received its necessary oxygen through the blood flowing through the mother's uterus to the placenta and from it to the baby, Dr. Juskevitch did not think that the baby would have suffered neurological damage provided it was delivered promptly after the tearing occurred.

Dr. Juskevitch opined that if Dr O'Connell had been informed at 3:09 p.m., the baby should and would have been delivered by 3:39 p.m. Because Dr. O'Connell was not advised by the nurses of the change in the mother's condition until 3:25 p.m., the baby was not delivered until 3:55 p.m., thirty minutes after Dr. O'Connell responded to the delayed page.

This delayed delivery was 46 minutes after the doctor should have been called at 3:09 p.m. and 16 minutes after the baby would have been delivered at 3:39 p.m., had the doctor been called at 3:09 p.m.[1] According to Dr. Larry E. White, a child neurologist called as an expert witness by the plaintiff, if the

---

[1] The time of 3:09 p.m. was used as a basis for Dr. Juskevitch's opinion because counsel for the defendant suggested to the court that Nurse Holder had testified this was the time when the nurses should have come in, evaluated the patent after her complaints of a worsening pain and immediately notified the doctor of this change in the nature of the pain. Counsel was wrong about the time; Nurse Holder testified that the nurses should have come in when the relatives told them of the worsening pain and the husband's evidence was that he did so at 3:00 p.m. Had the correct earlier time been the basis for the opinion, the time period for a safe delivery would have increased.

6

baby had been delivered 15 minutes before 3:55 p.m., or by 3:40 p.m., she would have sustained no neurological damage.

Kacie, by her mother and next friend, and Kacie's parents joined in this action against Mary Immaculate Hospital to recover damages arising from Kacie's delayed delivery. The plaintiffs have not appealed the trial court's limitation of their claims to the following: (1) Kacie, for her injuries and disabilities, (2) Kacie's parents, for their medical expenses, and (3) Kacie's mother, for her emotional distress.[2]

During the several-day jury trial, the court denied the defendant's motion to strike the plaintiffs' evidence made at the conclusion of the plaintiffs' evidence but took under advisement the same motion made at the conclusion of all the evidence. When the jury was unable to agree upon a verdict following deliberation for a period of over two days, the court discharged the jury, declared a mistrial, and, after additional argument, finally struck the plaintiffs' evidence and entered summary judgment for the defendant. The plaintiffs appeal.

The plaintiffs contend that their evidence was sufficient to raise two factual issues: (1) whether the nurses were negligent in their delayed response and notification of Dr. O'Connell; and (2) whether that negligence was a proximate cause

7

of Kacie's neurological disabilities and the other damages claimed. During oral argument on appeal, the defendant conceded, and we agree, that the evidence was sufficient to create a jury issue regarding the alleged negligence of the nurses. Defendant argues, however, that the plaintiffs' evidence was insufficient as a matter of law to establish that such negligence was a proximate cause of the damages sustained.

To support that claim, the defendant argues that, even if the nurses were negligent between "3:00 and 3:11,"[3] there was no evidence that, had the necessary information been communicated to a reasonably prudent obstetrician/gynecologist during that period, anything he or she would or should have done "would have changed the result to Kacie." We do not agree with the defendant.

The defendant fails to state the evidence and all reasonable inferences deducible therefrom in the light most favorable to the plaintiffs whose evidence was struck, as required by well-settled appellate principles exemplified in Hadeed. Instead, the defendant seeks to confine the crucial period of its negligence to an 11-minute period, overlooking evidence in the record from which a jury could have found that

---

[2] We refused the defendant's appeal of the court's recognition of the mother's right to assert a claim for emotional distress.

[3] The defendant does not cite a source for its 3:11 p.m.

its negligence extended over the 25-minute period before the nurses informed Dr. O'Connell of the mother's change of condition. The jury could have found that this 25-minute period, when combined with the 30-minute period it took Dr. O'Connell to deliver Kacie after the 25-minute delayed notification, effectively destroyed Kacie's chances of being delivered without neurological damage.

This was because Dr. White opined that the neurological damage to Kacie occurred 15 minutes before her birth at 3:55 p.m. and that no such damage would have occurred if Kacie had been delivered 16 minutes earlier, or by 3:39 p.m. Thus, the jury could have found that had Dr. O'Connell been notified by 3:09 p.m., she would have delivered Kacie without neurological damage by 3:39 p.m.[4]

Indeed, the jury could have found proximate causation even under the theory of the defendant's expert witness, Dr. Jay Paul Goldsmith. He opined that the uterine rupture was complete and the blood flow to the fetus had entirely ceased between 3:23 p.m. and 3:25 p.m. and that "you had 10 to 20 minutes after that when the injury occurred." Reviewing this evidence in the light

---

hypothesized time and we were unable find one.

[4] The defendant advisedly does not claim that Dr. O'Connell negligently delayed Kacie's delivery. Three doctors, two of whom were defendant's experts, testified that a 30-minute reaction time after the doctor's notification was within the standard of care.

most favorable to the plaintiffs, the jury could have concluded that if Dr. O'Connell had been called promptly at 3:00 p.m., the baby could have been delivered without extensive neurological damage at any time up to 3:45 p.m., "20 minutes after" the blood flow entirely ceased.

In explaining why it sustained the defendant's motion to strike the evidence, the trial court discussed and rejected parts of Dr. Juskevitch's opinion which conflicted with the opinions of the defendant's experts. In doing so, the trial court violated the principle we articulated in a similar situation in Austin v. Shoney's, Inc., 254 Va. 134, 138, 486 S.E.2d 285, 287 (1997), by assessing the weight and credibility of the evidence and rejecting inferences favorable to the plaintiffs which did not defy logic and common sense.

Reviewing the evidence in accordance with the principles set forth above, we conclude that the evidence was sufficient to raise a jury issue regarding the nurses' negligence and whether such negligence proximately caused Kacie's injuries and the other injuries and losses claimed. Hence, we hold that the trial court erred in striking the plaintiffs' evidence and in entering summary judgment for the defendant.

Accordingly, we will reverse the judgment in favor of the defendant and remand the case for a new trial.

<u>Reversed and remanded.</u>