Present:  All the Justices

JAMES R. POLIQUIN, M.D., ET AL.

v.  Record No. 961719

FELICIA DANIELS, ADMINISTRATRIX
  OF THE ESTATE OF SAMUEL DANIELS, DECEASED

               OPINION BY JUSTICE ROSCOE B. STEPHENSON, JR.
                         June 6, 1997

M. ABEY ALBERT, M.D., ET AL.

v.  Record No. 961761

FELICIA DANIELS, ADMINISTRATRIX
OF THE ESTATE OF SAMUEL DANIELS, DECEASED

          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                  Melvin R. Hughes, Jr., Judge


     These two related medical malpractice cases present issues
regarding (1) the testimony of expert witnesses, (2) the
sufficiency of the evidence to support the trial court's
judgment, and (3) the refusal of certain jury instructions.

                              I

     Samuel Daniels (Daniels) died following surgery on June 13,
1993.  His widow, Felicia Daniels (the Plaintiff), qualified as
administratrix of the estate and, thereafter, filed a motion for
judgment against James R. Poliquin, M.D., a general surgeon,
along with his professional corporation, Commonwealth General and
Vascular Surgery, P.C. (collectively, Poliquin), and against M.
Abey Albert, M.D., an anesthesiologist, along with his
professional group, Midlothian Anesthesia Associates, Inc.
(collectively, Albert).  The Plaintiff alleged that Drs. Poliquin
and Albert negligently breached the applicable standards of care
and that their negligence proximately caused Daniels' death.

The case was tried by a jury which returned a verdict in favor of the Plaintiff against Poliquin and Albert in the amount of $1,004,929.14.  After considering the defendants' motions to set aside the verdict, the trial court overruled the motions, except to reduce the amount of the verdict to $1,000,000 in accordance with the statutory limitation on recovery.  Code § 8.01-581.15.  On May 29, 1996, the trial court entered final judgment on the verdict as amended.  Poliquin and Albert (collectively, the Defendants) appeal.

## II

According to established law, we must view the evidence in the light most favorable to the Plaintiff, the prevailing party at trial.  On June 12, 1993, Daniels went to a medical clinic for treatment of a perirectal abscess and associated pain and fever.  The clinic referred Daniels to the emergency room of Johnston-Willis Hospital for further evaluation.  At the hospital, Daniels was examined by Dr. Poliquin who determined that the abscess required surgery.  Dr. Poliquin admitted Daniels to the hospital and scheduled him for surgery the next morning.

Daniels was hypertensive, diabetic, and obese, and, because of the surgical risks associated with these conditions, Dr. Poliquin ordered, among other tests, an electrocardiogram (EKG) to detect whether Daniels had any pulmonary or cardiac diseases.  The EKG was performed on June 12, 1993, about 10:30 p.m., and Dr. Poliquin referred the EKG tracing to a cardiologist for

- 2 -

interpretation.

On the morning of June 13, Dr. Albert arrived at the hospital to administer the anesthesia for Daniels' surgery. Dr. Albert noted that Daniels was obese and had a history of hypertension and diabetes and that Daniels suffered from shortness of breath. Dr. Albert also noted that the EKG tracing, which had not yet been interpreted by a cardiologist, showed signs of abnormality, but he neither reported that fact to Dr. Poliquin nor sought an interpretation of the tracing by a cardiologist.

The surgery, performed by Dr. Poliquin, proceeded as scheduled, and Daniels was placed under general anesthesia. At the conclusion of the surgery, Dr. Albert noticed that Daniels was experiencing difficulty breathing, and he attempted to intubate Daniels again. Daniels, however, became unresponsive, went into cardiac arrest, and, despite resuscitation efforts, died.

Later on the morning of June 13, a cardiologist interpreted Daniels' EKG tracing and noted that it showed that Daniels possibly had previously suffered a myocardial infarction; i.e., heart attack. According to an autopsy, Daniels had suffered a silent myocardial infarction at least one week prior to his death.[1]

_____

[1]At trial, an expert witness explained that a silent myocardial infarction "refers to the fact that the patient does not feel pain . . . . It is typically found . . . in patients who are diabetics . . . . So it's not uncommon for a diabetic

At trial, Dr. Stephen Carl Rerych, a general surgeon, Dr. Richard J. Hart, Jr., a cardiologist, and Dr. Brian Gerard McAlary, an anesthesiologist, were called by the Plaintiff as expert witnesses. They explained that surgery under general anesthesia places stressful demands on the heart. They further explained that a healthy heart tolerates these stresses, but a patient who has had a myocardial infarction is at risk during surgery.

Dr. Rerych, over the Defendants' objection, testified regarding the standard of care required of a general surgeon. He stated that the standard of care required a surgeon to know prior to surgery the results of tests ordered and that this was particularly important for a patient like Daniels, with a high risk for undiagnosed heart disease. Therefore, before surgery on such patients, a surgeon must order an EKG and receive an interpretation of the results by a qualified physician. Dr. Rerych opined that Dr. Poliquin's failure to ascertain the results of the EKG prior to performing the surgery was a violation of a surgeon's standard of care.

Dr. Hart testified that diabetics are at risk for silent myocardial infarctions and, therefore, a proper interpretation of Daniels' EKG by a cardiologist was essential. Such an interpretation would have led to a cardiac evaluation which would

(..continued)
not to have chest pain, and, yet, they have a major heart problem going on."

have shown the extent of the damage to Daniels' heart from the silent myocardial infarction.  With this knowledge, Drs. Poliquin and Albert could have explored other treatment options that, in Dr. Hart's opinion, would have prevented Daniels' death.

Dr. McAlary was the Plaintiff's expert witness on the standard of care for an anesthesiologist treating a patient like Daniels.  Dr. McAlary testified that an anesthesiologist must be sensitive to the possibility that a diabetic may have had a silent myocardial infarction and may have heart disease, particularly when the patient is also hypertensive and obese.  He also testified that there were a variety of available monitoring options that would have provided the surgical team with early indications of Daniels' heart failure and that such early indications would have led to immediate treatment.  Dr. McAlary opined that Daniels would have survived the surgery had appropriate actions been taken for his condition.  According to Dr. McAlary, Dr. Albert breached the standard of care required of an anesthesiologist by failing to know the interpretation of the EKG tracing, to consult with a cardiologist which consultation would have led to invasive monitoring, and to use invasive monitoring of Daniels during surgery.

### III

Following a _voir_ _dire_ hearing, the trial court qualified Dr. Rerych as an expert witness on the standard of care for a general surgeon in Virginia.  Poliquin contends on appeal, as at trial,

that the trial court erred in qualifying Dr. Rerych.

Code § 8.01-581.20 provides for a statewide standard of care in medical malpractice cases unless a health care provider proves that a local standard of care is more appropriate. Neither the General Assembly nor this Court has ever recognized a nationwide standard of care. Code § 8.01-581.20 provides, in pertinent part, as follows:

> [I]n any action against a physician . . . to recover damages alleged to have been caused by medical malpractice . . . in this Commonwealth, the standard of care by which [the alleged malpractice is] to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted . . . . Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified and certified. <u>This presumption shall also apply to any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia</u>.

(Emphasis added.)

Dr. Rerych received a medical degree from Columbia University College of Physicians and Surgeons in New York. Thereafter, he attended a surgical residency program in North Carolina at Duke University Medical Center. From 1985 to 1986, Dr. Rerych was Chief Resident in General and Thoracic Surgery at Duke University Medical Center, and, from 1986 to 1991, he served as Assistant Clinical Professor of General, Thoracic, and Vascular Surgery at the same facility. Dr. Rerych is a board

- 6 -

certified general surgeon.  He is licensed to practice general surgery in North Carolina and has practiced his specialty in North Carolina since 1988.

During voir dire, Dr. Rerych testified that he was "clearly eligible" for licensure in Virginia.  Additionally, the trial court received into evidence a letter to that effect from the Commonwealth's Department of Health Professionals.  Dr. Rerych also testified that he knew "the standard of care that would have prevailed in Virginia in June of 1993 with respect to the issues in this case."  However, the doctor, when asked if he was making an "assumption . . . with regard to the [standard of] care in Virginia," answered, "A strong assumption."

Poliquin asserts that, even if Dr. Rerych met the requirements for licensure in Virginia, his testimony rebutted the statutory presumption and showed that he did not know the standard of care in Virginia.  We do not agree.  The voir dire hearing was extensive, and, at the conclusion thereof, the trial judge stated:  "I'm going to overrule the objection[;] the witness is qualified by the thinnest of reeds under the statute."  Thus, the trial court weighed all the evidence before it, applied the statutory presumption, and concluded that Dr. Rerych was qualified to testify as to the standard of care in this Commonwealth.

The question whether a witness is qualified to express an expert opinion rests within the sound discretion of the trial

court.  <u>King</u> v. <u>Sowers</u>, 252 Va. 71, 78, 471 S.E.2d 481, 485 (1996).  We cannot say, based upon the record before us, that the trial court abused its discretion in qualifying Dr. Rerych as an expert witness.

IV

A

Both Albert and Poliquin contend that no evidence was presented to show that their alleged negligence proximately caused Daniels' death.  Thus, they assert, the trial court erred in overruling their motions to strike the evidence and to set aside the verdict.

In medical malpractice cases, as with other tort litigation, issues of negligence and proximate cause are ordinarily questions of fact for a jury.  <u>Brown</u> v. <u>Koulizakis</u>, 229 Va. 524, 531, 331 S.E.2d 440, 445 (1985).  Only when reasonable minds could not differ about such issues do they become questions to be decided by a court.  <u>Hadeed</u> v. <u>Medic-24, Ltd.</u>, 237 Va. 277, 285, 377 S.E.2d 589, 593 (1989).  In viewing the evidence, an appellate court must give the prevailing party at trial the benefit of all substantial conflict in the evidence and all inferences reasonably deducible therefrom.  <u>Id</u>. at 280-81, 377 S.E.2d at 590.  Thus, a verdict should not be set aside unless it is contrary to the evidence or without evidence to support it.  Code § 8.01-430; <u>Brown</u>, 229 Va. at 531, 331 S.E.2d at 445.

In the present case, the Defendants contend that the

evidence, at most, showed only what <u>might</u> have occurred, rather than what necessarily <u>would</u> have occurred had the Plaintiff's experts' recommended standards of care been followed.  They assert that there was a complete lack of expert testimony that their alleged negligence caused Daniels' death.  We do not agree.

In medical malpractice death cases, a plaintiff is not required to prove to a certainty that the patient would have survived had certain actions been taken.  <u>Brown</u>, 229 Va. at 532, 331 S.E.2d at 446; <u>Whitfield</u> v. <u>Whittaker Mem. Hospital</u>, 210 Va. 176, 184, 169 S.E.2d 563, 569 (1969).  A defendant physician's action or inaction which "has destroyed any substantial possibility of the patient's survival" is a proximate cause of the patient's death.  <u>Brown</u>, 229 Va. at 532, 331 S.E.2d at 446; <u>accord</u> <u>Bryan</u> v. <u>Burt</u>, 254 Va. ___, ___, ___ S.E.2d ___, ___ (1997) (this day decided); <u>Whitfield</u>, 210 Va. at 184, 169 S.E.2d at 568.

In the present case, each of the Plaintiff's experts testified that it was his opinion to a reasonable degree of medical probability that, had the Defendants known what they should have known about Daniels' condition prior to surgery and, thereafter, employed the appropriate procedures during surgery, Daniels would have survived the surgery.  Therefore, we think the trial court properly submitted the issue of proximate cause to the jury.[2]

_____

    [2]On brief, Poliquin presents the question whether the Plaintiff showed a breach of the standard of care for general

The Defendants further contend that the trial court erred in allowing the testimony of Norman Fayne Edwards, Plaintiff's economic damages expert. The Defendants objected to Dr. Edwards' testimony because, in formulating the present value of Daniels' lifetime income, Dr. Edwards based his calculations on life expectancy tables contained in Code § 8.01-419 and on tables published by the United States Department of Labor (DOL). They assert that the Plaintiff's own evidence contradicted the assumptions which served as the basis for Edwards' opinions.

According to Dr. Edwards, Daniels, who was 38 years old when he died, had a life expectancy of 34.6 years pursuant to Code § 8.01-419. Under the DOL tables, Daniels had a work life expectancy of 24 years, or to age 63.

Dr. Hart testified that, had Daniels survived the surgery, he would have lived no more than 10-15 years, unless he made significant lifestyle changes. If he had made such changes, including losing 100 pounds within a year and exercising, his life expectancy would have been 20-25 years.

Code § 8.01-419 provides that the table of life expectancy set forth therein shall be received "as evidence, <u>with other evidence as to the health, constitution and habits of [the] person</u>" in issue. (Emphasis added.) As we said in <u>Edwards</u> v.
(..continued)
surgeons in the Commonwealth. Poliquin, however, did not file an assignment of error relating to this issue, and therefore, we will not consider it on appeal. Rule 5:21(i).

Syrkes, 211 Va. 600, 602, 179 S.E.2d 902, 903 (1971),

> it is the duty of the court, when so requested in an
> action for wrongful death, to tell the jury that a
> mortality table introduced into evidence is to be
> considered . . . along with all the other evidence
> relating to the health, habits and other circumstances
> of the person which may tend to influence his life
> expectancy.

In the present case, the trial court properly instructed the jury, in accordance with Edwards, that it "should consider [Daniels' life expectancy of 34.6 years] along with any other evidence relating to the health, constitution, and habits of . . . Daniels in determining his life expectancy."  Thus, based upon the evidence before it, the jury could determine Daniels' life expectancy in formulating the present value of his lifetime income.  We hold, therefore, that the trial court did not err in allowing Dr. Edwards' testimony.

C

Finally, the Defendants contend that the trial court erred in refusing their tendered instructions B, C, and D.  We think the legal principles set forth in those instructions were adequately and objectively covered in granted instructions 1, 13, and 17.  "When granted instructions fully and fairly cover a principle of law, a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle."  Stockton v. Commonwealth, 227 Va. 124, 145, 314 S.E.2d 371, 384, cert. denied, 469 U.S. 873 (1984); accord Hubbard v. Commonwealth, 243 Va. 1, 16, 413 S.E.2d 875, 883

- 11 -

(1992).  Therefore, we conclude that the jury was fully and fairly instructed and the trial court did not abuse its discretion in refusing instructions B, C, and D.

V

In sum, we hold that the trial court did not err in qualifying Dr. Rerych as an expert witness, submitting the proximate cause issue to the jury, allowing Dr. Edwards' testimony, and refusing certain jury instructions.  Accordingly, we will affirm the trial court's judgment.

Affirmed.