**Loretta Jones MURRAY, Executrix and Personal Representative of the Estate of Weston Murray, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. CIV. A. 4:98CV41.

United States District Court,
E.D. Virginia,
Newport News Division.

Feb. 25, 1999.

Larry W. Shelton, Shelton & Malone, P.C., Norfolk, VA, for Plaintiff.

Anita K. Henry, Asst.U.S.Atty., U.S. Attorney's Office, Norfolk, VA, for Defendant.

## ORDER and OPINION

MORGAN, District Judge.

This matter came before the Court on the Complaint ("Plaintiff's Complaint") filed by the Plaintiff, Loretta Jones Murray, Executrix and Personal Representative of the Estate of Weston Murray ("Mrs. Murray" or "Plaintiff"). The Plaintiff's Complaint alleged that the Defendant, the United States of America, through its agents, provided negligent medical care to the Plaintiff's husband, Weston Murray ("Mr.Murray"), and that such negligent medical care was the sole proximate cause of his death. After a bench trial, the Court FOUND the Defendant's negligent and GRANTED judgment in favor of the Plaintiff in the amount of $267,282.23 including taxable Court costs, on January 8, 1999. This Opinion further explains the Court's reasoning.

## I. Procedural History

Mrs. Murray filed her Complaint on March 19, 1998, alleging that her cause of action arose under the Federal Tort Claims Act, 28 U.S.C., § 2671, et seq., and that jurisdiction arose under 28 U.S.C., § 1346(b)(1). The Defendant filed its Answer on May 28, 1998, denying that its agents acted negligently and denying all liability. The Defendant's Answer did not contest the statutory basis for the claim or for this Court's jurisdiction. The Plaintiff filed a Motion to File an Amended Complaint on December 7, 1998, and this Court granted that Motion by Order entered December 18, 1998.

The Plaintiff's Amended Complaint ("Plaintiff's Complaint") alleged that McDonald Army Community Hospital ("McDonald") admitted Mr. Murray at approximately 1:03 a.m. on November 26, 1996, with complaints of vomiting and severe abdominal pain. After an examination and several diagnostic tests, Mr. Murray was released at approximately 2:45 a.m. with a diagnosis of a urinary tract infection. Mr. Murray collapsed while waiting for his wife to bring their car to the entrance of McDonald, and was subsequently readmitted. The Complaint alleges that at approximately 3:40 a.m. Mr. Murray collapsed a second time in the examining room. At 3:55 a.m. Mr. Murray lost his pulse, and at 4:33 a.m. he was pronounced dead. The cause of death was later determined to be a ruptured right common iliac artery aneurysm ("ruptured iliac aneurysm").

The Plaintiff's Complaint alleges that Mr. Murray was critically ill when he entered McDonald and required immediate diagnosis and lifesaving surgery. The Complaint alleges that the Defendant's failure to correctly diagnose and surgically repair Mr. Murray's ruptured iliac aneurysm was the sole proximate cause of his death. The Plaintiff seeks funeral expenses, lost income, damages for sorrow and solace, and other damages provided by the Virginia Wrongful Death statute. On September 17, 1998, the Plaintiff filed an administrative claim for $1,000,000 with the Department of the Army through the office of the Staff Advocate, at Fort Eustis, Virginia, pursuant to 28 U.S.C., § 2675. The Defendant has not disputed that the Plaintiff filed the statutorily required administrative claim. The matter was set for bench trial before this Court to commence on January 6, 1992.

## II. *Pertinent Facts*

### A. The Plaintiff's Evidence

Mrs. Murray married Mr. Murray in 1986. He had four children from a previous marriage who were 23, 31, 36 and 39 years old, respectively. Mr. Murray was retired from the military in 1996 and received a monthly pension check for $1262.00. He also worked as a waiter at the George Washington Inn in Colonial Williamsburg for thirty hours a week and was paid roughly $625.00 per month for that work. She testified that on several occasions he had discussed with her his plan to work as a waiter for another ten years, until he was seventy years old. Mrs. Murray further testified that she and her husband had opened a thrift store named "The Matchbox" in September of 1996.

On November 25, 1996, Mrs. Murray stated that Mr. Murray closed the Matchbox and arrived at their home around 8 p.m. He told her that he was suffering from a great deal of abdominal pain, and informed her of his intention to lay down. Around midnight, Mr. Murray told his wife that his pain had not subsided, he had been vomiting, and that he needed to go to the hospital. They arrived at McDonald some time around 1:00 a.m. and entered its Urgent Care Center. At McDonald, Mrs. Murray stated that Dr. James Hendricks ("Dr.Hendricks"), who was on duty that night in the Urgent Care Center, examined her husband. According to Mrs. Murray, Mr. Murray told Dr. Hendricks that "it feels like a hernia, like something is popping in my stomach." Her husband made this same complaint in her presence at least three times to various members of the Mc-Donald staff. She was not present the entire time her husband was being examined. Dr. Hendricks ordered several diagnostic tests and subsequently informed Mr. Murray, in her presence, that he had a urinary tract infection. Mr. Murray questioned Dr. Hendricks about that diagnosis, stating that he had never heard of a man having a urinary tract infection. Dr. Hendricks responded by saying that men could suffer from urinary tract infections. Before his release, Mr. Murray also asked Dr. Hendricks for some medication to relieve his pain.

The Urgent Care Center released Mr. Murray at approximately 2:45 a.m., and Mrs. Murray and her husband walked to the door where he asked her to bring the car around while he waited. However, before Mr. Murray could enter the car, he collapsed and Mrs. Murray rushed into McDonald to find assistance. Mr. Murray was then readmitted, and then collapsed a second time in the examining room at 3:40 a.m. After attempts to resuscitate Mr. Murray were unsuccessful, he was pronounced dead at 4:33 a.m. Mrs. Murray was then told by the McDonald staff that her husband had died of a heart irregularity.

In December of 1997, Mrs. Murray qualified as executrix of Weston Murray's estate. She testified that she incurred funeral expenses totaling $8,397.43. She also stated that Mr. Murray's youngest daughter, Martina, was still in college when he died. In addition to providing financial support for her, Mr. Murray also provided financial support for all of his older children when they needed it. Mrs. Murray described her husband as a kind, loving man, with whom she had a very close and interdependent relationship.

Two of Mr. Murray's children testified, Michelle Parry ("Michelle"), 39, and Monica Spry ("Monica"), 32. Michelle stated that she lives in Newport News, Virginia, near her father. Michelle stated that she was divorced and that her father's assistance with her children had been very important. According to Michelle, Mr. Murray's sudden death had a significant impact on all of his children and grandchildren. Monica testified that she also lives in Newport News and has two children with whom Mr. Murray was very close and saw on regular basis. Monica further stated that her father had financially supported Martina, his youngest daughter, and had a close relationship with all of his children. She concluded by describing the significant impact Mr. Murray's death had had on all of his children, especially his son.

The Plaintiff's other witnesses included Dr. Phillip Leavy, an emergency room physician and expert witness ("Dr.Leavy"), Captain Jimmy Green, M.D., staff pathologist at the Portsmouth Naval Medical Center

("Capt.Green"), and Dr. Earl Strahorn ("Dr.Strahorn"), a vascular surgeon and expert witness.

The Court **FINDS** that a CT–Scan is the generally accepted tool through which isolated common iliac aneurysms are diagnosed. It is undisputed that Mr. Murray's cause of death was this form of aneurysm. While the defendant did not formally admit negligence, it directed its efforts primarily toward the proximate cause issue, contending that by the time of his presentment to the clinic, allowing a reasonable time for attempted diagnosis, it was already to late to save his life.

The Court **FINDS** that the diagnosis of urinary tract infection was unsupported by the medical evidence, and the lack of an accurate diagnosis compelled the clinic physician to arrange an emergency CT–Scan. The Court **FINDS** that the CT–Scan should have revealed the aneurysm and established the need for immediate surgery to save Mr. Murray's life.

Dr. Leavy testified that he was board certified as an emergency room physician in 1980, that he practiced with the Emergency Room Physicians of Tidewater, and that he had been chairman of a peer review committee. That committee reviewed and counseled emergency rooms and their physicians at over twenty hospitals throughout the Commonwealth of Virginia. Furthermore, the committee had set the standards for the different levels of emergency room care. Dr. Leavy described Riverside Regional Medical Center in Newport News as a level two trauma center. According to Dr. Leavy, level two trauma centers are required to have doctors on-call who can arrive within fifteen to twenty minutes and have CT–Scan technicians in-house twenty-four hours a day. Dr. Leavy stated that he was very familiar with the standard of care required of emergency room physicians and this standard applied to physicians serving urgent care centers.

Dr. Leavy testified that he had reviewed the medical records of Mr. Murray's visits to McDonald on November 26, 1996. Based on those records and his own expertise, Dr. Leavy stated that it was his opinion that Dr. Hendricks' diagnosis and treatment of Mr. Murray fell well below the standard of care applicable to emergency room physicians. He further stated that in his expert opinion, Dr. Hendricks made the following mistakes in diagnosing and treating Mr. Murray: (1) he failed to do a complete physical exam, (2) he failed to properly evaluate the lab results, which clearly did not indicate a diagnosis of urinary tract infection, (3) he improperly evaluated the X-rays failing to notice the obscuring of the psoas muscle, (4) he failed to test for blood in the stool, (5) he failed to palpate the femoral artery which could have discovered the ruptured iliac aneurysm, (6) he failed to consider that vomiting is not a symptom of a urinary tract infection, and (7) he failed to refer Mr. Murray to another hospital for further diagnostic tests, specifically a CT–Scan, which would have indicated the ruptured iliac aneurysm.

Dr. Leavy stated that a proper reading of the lab results accompanied by a more complete physical exam would have led to the conclusion that the cause of the pain was unknown and that further diagnostic tests were necessary. Furthermore, those diagnostic tests would necessarily have included a CT–Scan, and possibly an ultra-sound, both of which would have required transferring Mr. Murray to another hospital. That second hospital also could have performed the surgery necessary to save Mr. Murray's life. Dr. Leavy concluded his evaluation of the record by opining that Mr. Murray would have survived if he had received the necessary emergency surgery before the aneurysm ruptured causing the loss of pulse, and that in his experience under these circumstances Mr. Murray had an 80 percent survival rate. Dr. Leavy conceded that abdominal pain is very common in emergency rooms. He stated that the iliac aneurysm is the second most common type of aneurysm, but that most iliac aneurysms are accompanied by an aortic aneurysm. Thus, isolated iliac aneurysms are not common.

Captain Jimmy Green ("Capt.Green"), M.D., has been the staff pathologist at the Portsmouth Naval Medical Center since 1992, and performed Mr. Murray's autopsy on November 29, 1996, at 0900 hours. Capt. Green determined that the cause of death was a ruptured common iliac aneurysm. He

further testified that Mr. Murray's aneurysm was relatively large and measured 5.5 centimeters by 4.0 centimeters by 3.5 centimeters, or roughly 77 cubic centimeters. He explained that arteriosclerosis, or fatty deposits in the artery, cause aneurysms. Capt. Green also testified that during the autopsy that he could not palpate the aneurysm, and noted that Mr. Murray was 5' 6" tall and weighed about 240 lbs. Capt. Green testified that the Portsmouth Naval Medical Center normally does two autopsy reports: an initial report after two to three days and a final report after the toxicology test results are received. In Mr. Murray's case three autopsy reports were completed, including one done by outside consultants. All three reports revealed the same cause of death. Finally, Capt. Green testified that he could not opine whether Mr. Murray's aneurysm could have been palpated while he was alive.

Dr. Strahorn, a vascular surgeon who practices in Norfolk, Virginia, testified that he had reviewed both Mr. Murray's medical records and his X-rays. Dr. Strahorn stated that in his expert opinion Mr. Murray was a good candidate for lifesaving surgery up until approximately 3:45 a.m. He explained that a preliminary reading from a CT–Scan would have indicated the common iliac aneurysm, and that in his opinion, a surgical resident could have clamped the artery in the event of a rupture immediately proceeding surgery. He stated that Mr. Murray had a seventy percent chance of survival if the surgery began while his artery was merely leaking, before it had fully ruptured. Finally, Dr. Strahorn suggested reasonable times for the various steps involved in a diagnosis and surgical repair of Mr. Murray's iliac aneurysm. First, the CT–Scan would require no more than ten to 15 minutes, because he believes the technician should zoom in on the abdomen once the large abnormality was noticed. Second, surgery preparation requires five to ten minutes, and third, Dr. Strahorn could have clamped the artery in six minutes. After the artery is clamped, a vascular surgeon has one hour within which to repair the artery.

## B. The Defendant's Evidence

The Defendant's witnesses included Dr. James Hendricks, Mr. Murray's treating physician, Dr. William Horstman, a radiologist who works at Leigh Memorial Hospital, Ronald K. Battle, a CT Technician at Mary Immaculate Hospital ("Mary Immaculate"), Paula Burcher, the director of radiological services at Riverside Regional Medical Center ("Riverside"), Dr. Michael Bono an Emergency Room Physician, Dr. Fernd Parent, a vascular surgeon, Dr. Kendall Mann, who was working in McDonald on November 26, 1996, Carol Van, a Registered Nurse at McDonald, Joyce Raynor, who was working at McDonald on November 26, 1996, and Lewis Valcort an EMT at the Urgent Care Center at McDonald. The first witness was Dr. James Hendricks, Mr. Murray's treating physician at McDonald on November 26, 1999. Dr. Hendricks is currently stationed at Fort Bragg in North Carolina and obtained his degree from the Philadelphia College of Osteopathy. In November 1996, Dr. Hendricks was stationed at Fort Eustis and was in his second year of residency.

Dr. Hendricks was the only physician on duty in the Urgent Care Center at McDonald in the early hours of the morning on November 26, 1996. He stated that he had ordered CT–Scans before and had experience performing abdominal exams. After examining Mr. Murray's medical records from that evening, portions of which he had prepared, Dr. Hendricks stated that a triage nurse first examined Mr. Murray at 1:05 a.m. on November 26, 1996. Dr. Hendricks first saw Mr. Murray at 1:15 a.m., and at 1:50 a.m., he ordered several diagnostic tests, including a blood work-up, urinalysis, and X-rays. Sometime after 2:10 a.m. he saw Mr. Murray a second time, and around 2:35 a.m. he diagnosed Mr. Murray's condition as a urinary tract infection. Dr. Hendricks prescribed an antibiotic and pain medication, and discharged Mr. Murray at 2:45 a.m.

Dr. Hendricks, using Mr. Murray's medical report as a reference, described Mr. Murray's pain as a "dull ache which flared up every so often," but stated that there was no acute distress. The medical report did not list Mr. Murray's height and weight. Dr.

Hendricks explained that his urinary tract infection diagnosis was based on the location and quality of Mr. Murray's pain, his elevated white blood cell count, and his slightly elevated blood sugar count. He stated that he saw no reason to suspect a vascular problem during Mr. Murray's first presentation. After the second presentation, Mr. Murray was put on a heart monitor at 3:05 a.m. and lost his pulse at 3:55 a.m. After attempting to revive Mr. Murray for thirty-eight minutes, he was pronounced dead at 4:33 a.m., on November 26, 1996.

Dr. Hendricks could not recall whether Mr. Murray described his pain as "feeling like a hernia," or whether Mr. Murray described his pain as severe. He did state that the Mr. Murray's pain appeared to be fluctuating. Furthermore, Dr. Hendricks indicated that he had done a lower extremity exam but could not remember whether he palpated the femoral artery. However, he did not do a peripheral exam in the arteries in the feet. Dr. Hendricks stated that he had no suspicion of an iliac aneurysm and admitted that he was unsure at that time what was wrong with Mr. Murray. Dr. Hendricks had referred patients for a CT–Scans at Langley Hospital, and was aware of McDonald's protocol for the transfer of a patient to a facility with a higher level of care. He does recall Mr. Murray asking for pain medication before his discharge at 2:45 a.m. and recalls that Mr. Murray's pain was worse during the second presentation. Dr. Hendricks persisted in his urinary tract infection diagnosis until Mr. Murray's collapse at 3:40 a.m.

The Defendant's next witness was Dr. William Horstman, a radiologist who is the Chairman of Radiology at Eastern Virginia Medical School. Dr. Horstman spends almost 50 percent of his work day reviewing CT–Scans and 30 to 40 percent of his day reviewing X-rays. He testified that the psoas muscle is obscured to some degree in 45 percent of patients. Furthermore, Dr. Horstman stated that the obscuring of the psoas may be caused by pathological reasons or it may not, and thus, he disagreed with Dr. Leavy's statement that the obscuring of Mr. Murray's psoas muscle was diagnostically significant. In his opinion, Mr. Murray's X-ray appears normal, despite the obscuring of the psoas muscle. A CT Technician can complete a CT–Scan by himself in ten to 15 minutes, and when a radiologist is on staff, the CT–Scan can be completed and interpreted in 15 to 20 minutes. However, if the CT–Scan were concentrated on the abdominal area it would take only five to ten minutes. When a radiologist is merely on call, the results of the CT–Scan can be transmitted to his or her home in several minutes. Dr. Horstman described the CT–Scan as an excellent tool for diagnosing large abdominal aneurysms and added that Mr. Murray's common iliac aneurysm would have been immediately apparent to either a CT technician or a radiologist viewing the CT–Scan image.

Ronald K. Battle ("Battle") has been a CT Technician at Mary Immaculate for ten years. He testified that a non-emergency abdominal CT–Scan takes twenty minutes, and that the on-call radiologists are available twenty-four hours a day to receive CT–Scan images over the phone lines. Mary Immaculate can convey those images in thirty seconds to a radiologist, and such a radiologist would be the first person that Battle would contact. Battle also stated no CT Technician was on duty in Mary Immaculate Hospital on November 26, 1996, between the hours of one and four in the morning. However, a CT Technician was on call and had thirty minutes to arrive at Mary Immaculate once contacted. Battle testified that he usually arrived at Mary Immaculate Hospital in fifteen to twenty minutes, and that he could diagnose an aneurysm.

Paula Burcher ("Burcher") is the Director of Radiological Services at Riverside and has managed the CT–Scan department there for twenty years. She stated that in her experience a CT–Scan took thirty minutes to complete, and seven minutes to transmit in 1996. Burcher further testified that at Riverside and all level 2 trauma centers CT Technicians and physicians had twenty minutes to respond to acute traumas when they are on-call. On November 26, 1996, Dr. John Wirth was the general surgeon on-call, and Dr. Hop Graham was the vascular surgeon on-call. Burcher was not sure if the general surgeon, the vascular surgeon or the radiologist were

on the premises in the early hours of the morning on November 26, 1996. Furthermore, she stated that the CT Technician on-call on November 26, 1996 lived seven miles away, and that a CT Technician could arrive at Riverside at the same time as an emergency patient referral from another hospital.

Dr. Michael Bono ("Dr.Bono") testified as the Defendant's expert emergency room physician and practices at the Emergency Physicians of Tidewater with Plaintiff's expert, Dr. Leavy. Dr. Bono practices emergency medicine at six hospitals in the Tidewater, Virginia area and lectures at the Eastern Virginia Medical School in Norfolk, Virginia. He stated that it is generally difficult to diagnose aneurysms, and that it is exceptionally difficult to diagnose isolated iliac aneurysms. Dr. Bono stated that he had only seen one isolated iliac aneurysm in fourteen years, but added that CT–Scans are 95% accurate in diagnosing such aneurysms. He further testified that he had never heard of a diagnosis based upon palpating an iliac aneurysm. Dr. Bono stated that he had reviewed Mr. Murray's medical records, including his X-rays, and that he believed it very unlikely that he could have diagnosed Mr. Murray's aneurysm during the initial presentation. He also stated that Mr. Murray lacked the classic symptoms of an aneurysm, such as abdominal pain, low blood pressure, and a pulsatile abdominal mass.

Dr. Bono further testified that Dr. Hendricks' physical exam was insufficiently documented, and that Dr. Hendricks should have done more thorough abdominal, extremity and genital exams. He also stated that he did not believe that Dr. Hendricks incomplete physical exam impacted his ability to diagnose Mr. Murray's iliac aneurysm. Dr. Bono further concluded that there was no negligent delay in the treatment and diagnosis of Mr. Murray during his first presentation. Regarding the second presentation, Dr. Bono testified that Dr. Henrdricks did violate the applicable standard of care during his treatment and diagnosis of Mr. Murray. That conclusion was based on the following facts: (1) Mr. Murray's pain was continuing and had intensified, (2) the urinary tract diagnosis was unsupported by the urinalysis and other lab results, and (3) therefore, Mr. Murray required further diagnostic tests, specifically a CT–Scan.

Dr. Fernd Parent ("Dr.Parent"), the Defendant's vascular surgeon, stated that he became board certified in general surgery in 1989 and in vascular surgery in 1991, and lectures four to six times a year at Eastern Virginia Medical School in Norfolk. Dr. Parent stated that he had published an article in the medical journal, Vascular Surgery, entitled "Aortic and Iliac Aneurysms." Dr. Parent described an aneurysm as the unusual enlargement of a blood vessel such that the affected vessel becomes at least twice its normal size. He described the location of the two iliac arteries, stating that they begin at the base of the aorta and proceed into the pelvis, each one moving towards a different leg. The iliac arteries end where the femoral arteries begin. Dr. Parent testified based on his experience and his review of the literature on iliac aneurysms, that they occur 90 percent of the time in conjunction with aortic aneurysms, and thus, an isolated iliac aneurysm, such as Mr. Murray's, occurs only ten percent of the time.

The only treatment for a bleeding aneurysm, defined as one that has ruptured and has begun leaking blood into the tissue surrounding the vessel, is emergency surgery to repair the vessel. Dr. Parent stated that when an individual begins to feel pain associated with an aneurysm, that the pain indicates two things. First, that the aneurysm is enlarging, and second, that the aneurysm has begun leaking and distending adjacent tissue. Most iliac aneurysms are discovered during a CT–Scan directed to undiagnosed pain or discomfort. The most common symptoms of an iliac aneurysm are pain and, after enough blood has been lost, low blood pressure. In Dr. Parent's opinion an isolated iliac aneurysm cannot be diagnosed by palpations because the iliac arteries are located deep within the pelvis. Furthermore, he does not see how Dr. Hendricks could have diagnosed Mr. Murray's iliac aneurysm because his symptoms were nausea, vomiting, pain, and blood pressure within the normal range. Dr. Parent also testified that he did not believe palpating the femoral and foot pulses would

have aided the diagnosis of Mr. Murray's iliac aneurysm. However, he admitted that a preliminary diagnosis of a potential abdominal or pelvic hemorrhagic catastrophe could have been made during Mr. Murray's first presentation.

However, Dr. Parent admitted that it is quite possible that Mr. Murray's femoral pulse could have been weakened by the iliac aneurysm. He also testified that Dr. Hendricks incorrectly diagnosed a urinary tract infection when the lab results did not support it, that such a misdiagnosis was "indefensible," and that because the lab results did not support any diagnosis, more diagnostic tests were necessary, specifically a CT–Scan. Therefore, Dr. Parent concluded that Dr. Hendricks should have recommended a transfer for a CT–Scan at 2:00 a.m., when the lab results returned and indicated no specific cause for Mr. Murray's pain. According to Dr. Parents, Mr. Murray's life could have been saved by surgery and a clamping of the artery up until the time he collapsed in the examining room at 3:40 a.m. Dr. Parent testified that it took him five minutes to prep for surgery, and six minutes to clamp Mr. Murray's iliac aneurysm. He also stated that the iliac aneurysm would have been readily apparent to either a radiologist or a CT Technician on a CT–Scan image because of its size.

Dr. Kendall Mann ("Dr.Mann") was working as the staff intern at McDonald on November 26, 1996, and participated in the attempt to resuscitate Mr. Murray. He testified that he received a page and reported to the Urgent Care Center in McDonald about 4:25 a.m. Dr. Mann then assumed responsibility for the attempt to resuscitate Mr. Murray, which had been ongoing for thirty minutes. At 4:33 a.m., Dr. Mann stopped life support and declared the time of death. Dr. Mann stated that there were no surgeons assigned to McDonald on November 26, 1996, and that he had referred and transferred patients to both Mary Immaculate and Riverside for CT–Scans in both emergency and routine situations. In an emergency situation, Dr. Mann stated that the treating physician would call one of those two hospitals and speak with an emergency room physician.

Once the transfer was arranged and the necessary paperwork completed, the patient would be transferred by ambulance to the receiving hospital. The whole process took thirty minutes to sixty minutes.

Carol Van, a registered nurse, testified that she has been the head nurse at the McDonald Urgent Care Center for two years, and that she had worked at the Center for four years. She stated that she had participated in the transfer of patients from McDonald to other facilities for CT–Scans between 60 and 80 times in her four years there. She admitted, however, that only one of those was an early morning transfer, such as Mr. Murray required. Van also stated that once the physician from McDonald has spoken to the physician from the receiving hospital that the transfer takes between 30 and 60 minutes. In her opinion and experience, the most important factor in a transfer is to stabilize the patient. Mr. Murray was stable until his collapse at 3:40 a.m.

Joyce Raynor testified that she works in MacDonald's Prime I, but that she never examined or treated Mr. Murray. Lewis Valcort ("Vaclort") stated that he is employed at the McDonald Urgent Care Center as an Emergency Medical Technician and was so employed on the night of November 26, 1996. His job includes transferring patients by ambulance to other facilities. Valcort remembered meeting Mr. Murray, and took his vital signs after his collapse in the examining room at 3:40 a.m. After the collapse Valcort believes it would have required ten minutes to move Mr. Murray to the ambulance for transfer because he was thrashing about. However, while Mr. Murray was stable, placing him in the ambulance would have taken less than five minutes. Valcort also provided testimony on the travel time from McDonald to Riverside, stating that it took ten to fifteen minutes with flashing lights and twenty minutes without lights; and that it took five to ten minutes with lights and ten to fifteen minutes without lights to drive to Mary Immaculate.

### III. The Applicable Standard of Medical Care

██  The applicable standard of care for an emergency room physician in the treatment

and diagnosis of a presenting patient is the same as that for an urgent care center in Virginia. The Defendant does not dispute that standard of care, and both the Plaintiff's and Defendant's expert witnesses agreed with this standard of care.

### Analysis

■ The applicable standard of medical care, as set forth by the Virginia Supreme Court, is that:

> [a] physician holds himself out as possessing the knowledge and ability necessary to the effective practice of medicine.\* \* \* However, he is not an insurer, nor is he held to the highest degree of care known to his profession. \* \* \* He must exhibit only that degree of skill and diligence employed by the ordinary, prudent practitioner in his field and community, or in similar communities, at the time.

*Reed v. Church,* 175 Va. 284, 292, 293, 8 S.E.2d 285, 288 (1940). *Accord Easterling v. Walton,* 208 Va. 214, 218, 156 S.E.2d 787, 790 (1967). Therefore, the Court FINDS that the standard it must employ in determining whether or not the Defendant was negligent is did the Urgent Care Center physician exhibit the degree of skill and diligence employed by the ordinary, prudent emergency room practitioner in his community.

### IV. The Test for Proximate Cause under Virginia Law

■ Once a party establishes the physician's negligence in diagnosis or treatment, the applicable test for proximate cause is whether that negligence destroyed a substantial possibility of the decedent's survival from the condition misdiagnosed or mistreated. *Whitfield v. Whittaker,* 210 Va. 176, 184, 169 S.E.2d 563, 568 (1969). *Bryan v. Burt,* 254 Va. 28, 486 S.E.2d 536 (1997), and *Poliquin v. Daniels,* 254 Va. 51, 486 S.E.2d 530 (1997), reaffirm the Virginia Supreme Court's decision in *Whitfield. Blondel v. Hays,* 241 Va. 467, 403 S.E.2d 340 (1991), which held that the substantial possibility of survival standard is the proper one for a motion to strike, but that it is not a proper instruction for the jury, may be distinguished. The Virginia Supreme Court did not cite *Blondel* in its

more recent opinions of *Bryan* or *Poliquin,* and this supports a finding that *Blondel* does not set forth the standard to be applied by the finder of fact.

### Analysis

The Virginia Supreme Court stated in *Whitfield* that:

> [w]hen a physician's or surgeon's negligent action or inaction has effectively terminated a person's chance of survival, he will not be permitted to raise conjectures as to possible chances for survival that he has put beyond realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened if certain actions had been taken. The law does not in all circumstances require a plaintiff to show to a certainty that a patient would have lived had he been operated on promptly.

210 Va. at 184, 169 S.E.2d at 568–69 (*citing Hicks v. United States,* 368 F.2d 626, 632 (1966) (citations omitted)). In *Brown v. Koulizakis,* the Virginia Supreme Court reaffirmed *Whitfield,* relying upon that case for the proposition that in a medical malpractice case involving wrongful death, proof that the defendant physician has destroyed a substantial possibility of the patient's survival becomes the proximate cause of the patient's death. 229 Va. 524, 532, 331 S.E.2d 440, 446 (1985) (*citing Whitfield,* 210 Va. at 184, 169 S.E.2d at 568–69). The *Brown* Court went on to hold that the plaintiff had presented sufficient evidence of negligence and proximate cause to carry both issues to the jury, and that the jury could have found that the inaction of the defendant doctor had deprived the plaintiff of a substantial possibility of survival. *Id.* In *Hadeed v. Medic–24, Ltd.,* the Virginia Supreme Court held that the defendant doctors failure to correctly diagnose the plaintiff decedent's severe coronary artery disease destroyed any substantial possibility that the plaintiff would survive. 237 Va. 277, 286–87, 377 S.E.2d 589, 594 (1989). The *Hadeed* Court stated that the jury could have found that the plaintiff had a eighty-five to ninety percent chance to live to age seven-

ty if he had undergone bypass surgery and that with only medical therapy he had a fifty percent chance of living to age sixty. *Id.* at 287, 377 S.E.2d at 594.

In *Blondel v. Hays,* the Virginia Supreme Court held that it was proper for a trial judge to decline to instruct the jury that if they believe the defendant destroyed a substantial possibility of survival that they should find the defendant liable. 241 Va. at 473–74, 403 S.E.2d at 344. The Court further stated that the Court should employ the substantial possibility of survival test to determine whether or not there exists sufficient evidence to submit the case to the jury, but that the jury's function is the same in a medical malpractice case as in any other tort action: to decide the issues of negligence, proximate cause and damages. *Id.* at 474, 403 S.E.2d at 344. A United States District Court in 1992 stated that the substantial possibility of survival theory did not provide a separate cause of action in a wrongful death action with diverse parties. *Dolwick v. Leech,* 800 F.Supp. 321, 327 (1992).

Less than two years ago the Supreme Court of Virginia held in *Poliquin v. Daniels* that where the Plaintiff's experts testified that if the defendants had known what they should have known about the plaintiff decedent's condition prior to surgery, and employed the appropriate procedures during surgery, that the decedent would have survived the surgery, the issue of proximate cause was properly submitted to the jury. 486 S.E.2d at 534. The Court cited *Whitfield* for the proposition that a defendant's action or inaction which has destroyed any substantial possibility of survival is a proximate cause of the patient's death. *Id.* The *Poliquin* Court also cited *Bryan,* which was decided the same day and also relied upon the standard set forth in *Whitfield* that evidence of the destruction of a substantial possibility of survival is proof of proximate cause. 486 S.E.2d at 538. In *Bryan* the Court upheld the trial court's decision to strike the plaintiff's evidence because she had failed to present any evidence of a course of treatment that could have increased her chance of survival from the date of the defendant's negligence. *Id.* at 540. Neither *Poliquin* nor *Bryan* cited *Blondel.*

The Court does not accept the proposition that under Virginia Law there are two tests which it must apply, one upon a motion for judgment as a matter of law in federal court, and another in its capacity as a finder of fact. The cases relied upon hold that if the plaintiff meets the substantial possibility of survival test, then the plaintiff has also met the general proximate cause test. Therefore, the Court **FINDS** that the proximate cause test which it must apply to the facts in this case is did the negligence of the Urgent Care Center physician deprive the Plaintiff of a substantial possibility of surviving the aneurysm. The Virginia Supreme Court has not defined substantial in this context, and therefore, the Court looks to the plain meaning of the word. Webster's Third New International Dictionary defines substantial as "not seeming or imaginary, not illusive, real or true."

## V. *The Application of the Law to the Facts*

The Court **FINDS** that the Defendant's negligence, through its agent Dr. Hendricks, destroyed a substantial possibility of Mr. Murray's survival of the aneurysm on November 26, 1996. Dr. Hendricks examination of Mr. Murray was incomplete, and further, his diagnosis of a urinary tract infection was unsupported by any of Mr. Murray's test results. Dr. Hendricks misdiagnosis and failure to order further diagnostic tests, specifically a CT–Scan, destroyed a substantial possibility of Mr. Murray receiving the life-saving surgery he required.

The Defendant tacitly, if not directly, conceded that Dr. Hendricks was negligent, but argued that even if Dr. Hendricks had not been negligent that there was not sufficient time available to save Mr. Murray by transferring him to either Mary Immaculate or Riverside, performing a CT–Scan, reading the results, preparing him for surgery, and performing that surgery. Therefore, the Defendant contends that Dr. Hendricks' negligence did not destroy a substantial possibility of Mr. Murray's survival because he did not have a substantial possibility of survival when he presented at McDonald.

Both Dr. Leavy and Dr. Bono testified (1) that Dr. Hendricks medical record of Mr. Murray from November 26, 1996 was incomplete, (2) that Dr. Hendricks physical exam was incomplete and inadequate, and (3) that the laboratory results did not support Dr. Hendricks diagnosis that Mr. Murray had a urinary tract infection. Furthermore, both Dr. Leavy and Dr. Bono stated that a CT–Scan was necessary because Dr. Hendricks should have recognized that he did not have a diagnosis for Mr. Murray's complaints. Dr. Bono, the Defendant's emergency room physician, testified that he probably would have ordered a CT–Scan for Mr. Murray within thirty minutes of having first seen him. Dr. Parent, the Defendant's vascular surgeon, described the error of a misdiagnosis in this case by Dr. Hendricks as "indefensible." Therefore, the Court **FINDS** that the Defendant, through its agent, Dr., Hendricks, was negligent in its diagnosis and treatment of Mr. Murray on November 26, 1996.

To establish liability, however, the Plaintiff must also establish that the Defendant's negligence destroyed a substantial possibility that Mr. Murray would have survived his iliac aneurysm, and thus, that Dr. Hendricks' negligence proximately caused Mr. Murray's death. The Court **FINDS** that the preponderance of the evidence establishes that Mr. Murray would have survived if he had arrived in an operating room ready for surgery prior to 3:55 a.m., when he lost his pulse.

Therefore, the issue that remains is whether Mr. Murray reasonably could have arrived in an operating room prior to 3:55 a.m., absent the Defendant's negligence. The Court **FINDS** that the time estimates for the various procedures necessary to transfer, diagnose, and perform a CT–Scan and surgery upon Mr. Murray were inconclusive. The evidence is also not clear regarding the specific time when Dr. Hendricks should have ordered a CT–Scan, and part of the reason for this lack of clarity is the insufficient medical record prepared by Dr. Hendricks on November 26, 1996. The Court **FINDS** that Dr. Hendricks should

have ordered a CT–Scan no later than 2:00 a.m. Based on all of the evidence before the Court, the Court **FINDS** that neither side has proven by a preponderance of the evidence whether or not the decedent could have secured life saving surgery by 3:55 a.m. Accordingly, the Court **FINDS** that the Plaintiff has not proven by a preponderance of the evidence that it is more probable than not that Mr. Murray would have survived. However, the Virginia law does not require that the Plaintiff prove it is more probable than not that he would have survived the aneurysm. The Court FINDS that Mr. Murray possibly could have obtained life saving surgery, and his possibility of survival in these circumstances was between thirty and sixty percent. The Court arrives at these percentages by combining the percentage survival rate with the possibility of obtaining surgery in the available time frame. The Court FINDS that thirty to sixty percent constitutes a substantial possibility that Mr. Murray could have obtained life saving surgery. Accordingly, the Court **FINDS** that the Plaintiff has proven that the Defendant's negligence was a proximate cause of the decedent's death. The final issue before the Court is the determination of the Plaintiff's damages.

## VI. *Damages*

The evidence regarding Mr. Murray's monthly earnings and his funeral expenses was undisputed. The life expectancy tables set forth in the Virginia Code establish that the decedent would have lived until age 78. Based upon that life expectancy the Court requested that the parties seek an agreement as to the pecuniary loss. The parties calculations agree that the pecuniary loss is $83,444.30, which represents the decedent's pension and projected earnings to age seventy discounted by two (2) percent value and divided by one-half (½).[1] The evidence also established that Mr. Murray and Mrs. Murray had a happy marriage, and that Mr. Murray played an integral and vital role in the lives of his children. The Defendant did not present any expert evidence from which

---

1. The parties agreement to these computations is without prejudice to their positions regarding other damages and without prejudice to the Government's position regarding its liability.

the Court could find that the decedent had a diminished life expectancy, and therefore, the Court **FINDS** that the Virginia life expectancy tables are applicable. The Court further **FINDS** that the Mr. Murray's life expectancy was 78 years at the time of his death.

Next, the Court must determine the amount of the three types of recoverable damages in a wrongful death suit: (1) funeral and burial expenses, (2) pecuniary damages, including lost income to beneficiaries, and (3) non-pecuniary damages, including damages for loss of services, solace, and comfort. The Court **FINDS** that the Plaintiff incurred $8,397.43 in funeral expenses. Second, the Court **FINDS** that Loretta Jones Murray is entitled to recover $83,444.30 in pecuniary losses from the Defendant.[2] Third, the Court **AWARDS** the Plaintiff Court costs of $440.50.

Fourth, the Court must decide the amount of non-pecuniary loss incurred by the decedent's wife and children. First, as a 60 year old man, Mr. Murray had lived most of his life before his premature death on November 26, 1996. Second, Mr. Murray and Mrs. Murray had a successful second marriage and had been married for ten years at the time of his death. The Court **FINDS** that Mrs. Murray is entitled to recover $75,000 in non-pecuniary losses from the Defendant. Based upon the evidence of Mr. Murray's care and concern for his children, the Court **FINDS** that each of Mr. Murray's four children are entitled to recover $25,000 in non-pecuniary losses from the Defendant, for a total of $100,000. Accordingly, the Court **FINDS** that the Plaintiff is entitled to recover $267,282.23 in total damages from the Defendant including taxable Court costs.

## VI. *Conclusion*

The Court **FINDS** that the Defendant, through its agent Dr. Hendricks, was negli-

gent in the diagnosis and treatment of Mr. Murray on November 26, 1996. The Court **FINDS** that under Virginia law proof by a preponderance of the evidence that the defendant's negligence destroyed a substantial possibility of the decedent's survival of the iliac aneurysm establishes such negligence as a proximate cause of the decedent's death. Accordingly, the Court **AWARDS** the Plaintiff $267,282.23 including taxable Court costs. The Court shall issue a supplementary order specifying the distribution of the judgment and costs among the beneficiaries and counsel.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel for both parties.

It is so **ORDERED**.

---

**2.** First, although the Plaintiff presented some evidence that Mr. Murray had provided irregular financial support for his adult children, insufficient evidence of any quantifiable amount of support was presented. Therefore, the Court has not awarded any pecuniary losses to the Plaintiff's children.

Second, the Plaintiff presented insufficient evidence regarding the viability or potential profitability of Mr. and Mrs. Murray's thrift store, "The Matchbox," and did not argue for damages related to the fact that Mrs. Murray had to close the business after her husband's death. Therefore, the Court has not awarded any pecuniary losses from the closing of "The Matchbox."