Present:  All the Justices

CINDY L. BRYAN,
PERSONAL REPRESENTATIVE, ETC.

                     OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 961409               June 6, 1997

STEVEN BURT, D.O., ET AL.

FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
James H. Chamblin, Judge

The main appellate issue in this wrongful death action, alleging medical malpractice against both an emergency room physician and a family practitioner, is whether the trial court erred in striking the plaintiff's evidence at the close of the plaintiff's case-in-chief.

Appellant Cindy L. Bryan, who sues as "Personal Representative and Administratrix of the Estate of Shirley A. Robertson, deceased," filed a motion for judgment against appellees Steven M. Burt, D.O., and Eric J. Maybach, M.D., seeking damages for the alleged wrongful death of the decedent. The plaintiff alleged that the decedent came to a hospital emergency department complaining of severe abdominal pain.  She alleged that Burt, the emergency room physician, diagnosed constipation as the cause of the pain when it actually was due to a perforated ulcer.  The plaintiff alleged Burt discharged the decedent from the hospital after several hours of examination and treatment.

Subsequently, the plaintiff alleged, when the pain did not subside, the decedent's family contacted the office of Maybach, the decedent's family physician.  The plaintiff further alleged

that as the result of Burt's misdiagnosis, which Maybach "knew or should have known of," the decedent's condition worsened and she died several months later while a patient in another hospital.

In a grounds of defense, Burt denied the plaintiff's allegations of negligence. Maybach filed a grounds of defense also denying he was negligent because "he was not involved in the care and treatment of" the decedent on the day of the alleged misdiagnosis.

Following presentation of the plaintiff's case-in-chief during a four-day jury trial in March 1996, the trial court sustained the defendants' respective motions to strike the evidence. We awarded the plaintiff an appeal from the trial court's April 1996 order entering summary judgment in favor of the defendants.

According to settled principles of appellate review governing a case in which the plaintiff's evidence has been struck at the close of the plaintiff's case-in-chief, we will recite the essential facts in the light most favorable to the plaintiff. Brown v. Koulizakis, 229 Va. 524, 526, 331 S.E.2d 440, 442 (1985).

The focus of this lawsuit is upon the events of December 13, 1992. Near 9:00 p.m. of that day, a Sunday, the plaintiff's decedent, age 53, went to the emergency department of the Fauquier Hospital in Warrenton, where she was examined and treated by Burt. She complained of pain "covering the entire

abdomen."  The patient stated she had experienced "the acute onset of the abdominal pain" about three hours earlier.

Upon examination, the patient's "vital signs" were normal. She gave a history of peptic ulcer disease, hypertension, headaches, "a cholesterol problem," and "problems with constipation."  She reported that she recently had been taking a number of different medications.

Burt ordered "lab work" and x-rays that were "of a standard nature" and "normal in this sort of situation."  Upon making a diagnosis of constipation, the physician ordered injection of a pain relieving drug, Toradol, and giving of "a high soapsuds enema" about 10:00 p.m.  Near 11:30 p.m., the patient began receiving "IV fluids, to run at approximately 500 cc's an hour."  About 35 minutes later, she was given "an oil retention enema."

The patient was discharged near 1:00 a.m. on December 14. Upon discharge, Burt instructed the patient to drink "lots of water," to pursue a "high fiber diet," to take specified doses of mineral oil, and "if no bowel movement" resulted, to take "8 oz. of citrate of Magnesia."  She was told to return to the emergency room "if fever or any vomiting" developed and to "follow-up" with her personal physician on December 14 or 15 "for recheck" of her blood pressure.

The patient returned to her home, accompanied by her daughter.  The pain continued, preventing the patient from sleeping.  Over the course of the next few hours, she took the

prescribed doses of mineral oil. The pain did not subside and the medication did not produce a bowel movement.

Before noon on December 14, the daughter called Dr. Maybach's office because the patient "wasn't feeling better." The daughter spoke with the physician's receptionist. The daughter called Maybach's office again near 3:00 p.m. on the 14th, and the receptionist relayed a recommendation from Maybach's nurse suggesting a laxative and an enema. Maybach was not present in his office when either call was received, and there was no request during either call for the physician to call the daughter.

Near 4:00 p.m. on December 14, the patient "started getting worse." She "started looking bad" and began "[g]asping for air." About 8:35 p.m., the daughter took her to the emergency room of the Fauquier Hospital, where the patient went into shock and was seen by Dr. Fortune Odend'hal.

Within hours, Dr. J. Paul Wampler performed exploratory abdominal surgery on the patient. As a result, she was diagnosed as having a perforated pyloric ulcer and acute respiratory distress syndrome (ARDS). A plaintiff's medical expert testified the ulcer perforated about 6:00 p.m. on December 13.

Following surgery, the patient's condition "stabilized" and she was admitted to the hospital. The patient remained there until she was transferred to the University of Virginia Medical Center at Charlottesville on February 5, 1993, where she died 20

days later. According to a plaintiff's medical expert, the cause of death was ARDS and respiratory failure. He testified that the ARDS was caused by the perforated pyloric ulcer.

Three medical experts testified for the plaintiff: Dr. Frederick L. Glauser, who is "Board Certified in internal medicine, pulmonary and critical care medicine"; Dr. Philip G. Leavy, an expert in "emergency medicine"; and Dr. Robert Bowman, a "family practitioner of general medicine" presently employed in a hospital emergency department. The plaintiff proffered Glauser as a so-called "causation witness" and Leavy as a so-called "standard of care" expert in emergency medicine; neither purported to express an opinion on the alleged malpractice of defendant Maybach.

Glauser's testimony can be summarized as follows. From a review of the medical records, he said "the medically initiating cause" of the decedent's death "was a perforated pyloric ulcer." Relying, in part, on his study of the pertinent x-rays, the witness opined that the ARDS began with the perforation of the ulcer at 6:00 p.m. on the 13th. He said there was a progression from the perforated ulcer to the ARDS to the death. Glauser's opinion was that the decedent had a 90 to 95 percent chance of survival at 6:00 p.m. on the 13th, a 75 to 80 percent survival chance on the 14th, and a 40 to 50 percent chance of survival on the 15th.

The trial court restricted Glauser's testimony on the basis

that he was attempting to offer opinions as a "standard of care" witness and not as a "causation" witness.  That action of the court is the subject of an assignment of error.  We shall not address the substance of the issue because any error committed by limiting the testimony was harmless; the expert fully expressed his views and the excluded information was supplied by the plaintiff's other experts.

Leavy's "standard of care" testimony can be summarized as follows.  He opined that Burt "violated the standard of care in his emergency room examination" of the decedent "on several occasions in several areas of his care" for her.

Specifically, the witness said, Burt failed "to appreciate the significance of the complaint of the abrupt onset of pain in the abdomen"; he "failed to appreciate the medication[s] she was taking and failed to get a history of . . . how often she had been taking them"; he failed to recognize she was being treated with a combination of medications that had a propensity to worsen ulcers; and Burt "turned away from the chief complaint and focused on the chronic constipation problem that she had."

In addition, the expert opined that Burt should have noticed "free air," an abnormal condition, in the decedent's abdomen that was revealed on the x-rays taken on the 13th.  The witness' "impression" was that most patients with "perforated ulcers will, in fact, have free air."  Also, the witness said Burt's conduct fell below the standard of care by not monitoring more frequently

the patient's vital signs during her four-hour emergency room stay on the 13th.

Bowman, proffered as a witness to testify about "the medical care" provided by both defendants to the decedent, opined that both "acted below the standard of care." Bowman's opinions on Burt's conduct were essentially the same as Leavy's. Focusing on the allegations against Maybach, who had been the decedent's family doctor for 18 years, Bowman criticized Maybach's prescription of certain medications in the past as inconsistent with "good care." He also testified: "In the care of her problem that brought her to the emergency room, I think there was an opportunity to have made the care for her in the emergency room to be more directed toward problems that might have diagnosed her correctly had communication been given." Continuing, he said: "I don't have enough information to be able to know what the communication was."

Additionally, the expert said that, upon the decedent's release from the emergency room following her stay on the 13th, Maybach's "office was contacted on two separate occasions and the information that was given was that she was continuing to have abdominal pain," and the suggested treatment was to "relieve what was diagnosed as a constipation problem." The witness said Maybach acted below the standard of care because there was no suggestion during the two calls "that she should be reexamined, either by himself or by going back to the hospital."

Also, the witness opined that the standard of care was violated when, assuming Maybach was not in the office when either telephone call was received, Maybach's receptionist or nurse failed "to obtain medical help" for the decedent when her daughter called. The witness said a prudent physician should establish "guidelines" for the office staff to cover such situations. The expert admitted, however, that if Maybach's staff had urged the decedent to return to Fauquier Hospital's emergency room on the 14th, the standard of care would have been met.

As we have said, the main question on appeal is whether the trial court erred in striking the plaintiff's evidence. The issues to be decided under this broad question are whether there was sufficient evidence of primary negligence, in the case of defendant Maybach, and of proximate cause, in the case of both defendants, to have carried those issues to the jury.

The applicable law is settled. A physician is neither an insurer of diagnosis and treatment nor is the physician held to the highest degree of care known to the profession. The mere fact that the physician has failed to effect a cure or that the diagnosis and treatment have been detrimental to the patient's health does not raise a presumption of negligence. Nevertheless, a physician must demonstrate that degree of skill and diligence in the diagnosis and treatment of the patient which is employed by a reasonably prudent practitioner in the physician's field of

practice or specialty.  <u>Brown</u>, 229 Va. at 532, 331 S.E.2d at 445.
<u>See</u> Code § 8.01-581.20.

In medical malpractice cases, a plaintiff must establish not only that a defendant violated the applicable standard of care, and therefore was negligent, the plaintiff must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death.  Thus, in a death case, if a defendant physician, by action or inaction, has destroyed any substantial possibility of the patient's survival, such conduct becomes a proximate cause of the patient's death.  <u>Brown</u>, 229 Va. at 532, 331 S.E.2d at 446.  <u>Accord</u> <u>Poliquin</u> v. <u>Daniels</u>, 254 Va. ___, ___, ___ S.E.2d ___, ___ (1997), decided today.

First, we shall consider the case against Dr. Burt.  He does not dispute that the plaintiff presented expert testimony which showed he breached the standard of care and which showed the cause of the decedent's death.  However, he contends the plaintiff failed to "present any expert testimony linking these two events."

The plaintiff argues that "proximate cause was shown by expert testimony of a loss of substantial possibility of Mrs. Robertson's survival."  We do not agree.

Certainly, the plaintiff presented evidence that Burt's failure to diagnose the perforated ulcer on December 13 constituted a violation of the standard of care, and that her chances of survival diminished from 90 to 95 percent on the 13th

to 40 to 50 percent on the 15th. Nonetheless, the plaintiff failed to present evidence of any course of treatment which should have been pursued on the 13th, given a diagnosis of a perforated ulcer, that would have increased the decedent's chances of survival. Affording the plaintiff benefit of all possible inferences, one could infer from the events of the 14th that, if the condition had been properly diagnosed on the 13th, the decedent would have been referred to a surgeon who would have been responsible for her care. But the record is silent about the details of that care and its possible effect on the patient's health.

This case is unlike Hadeed v. Medic-24, Ltd., 237 Va. 277, 377 S.E.2d 589 (1989); Brown, supra; and Whitfield v. Whittaker Mem'l Hosp., 210 Va. 176, 169 S.E.2d 563 (1969), relied on by the plaintiff. In each of those cases, holding proximate cause to be a jury issue, the plaintiff presented testimony to establish the nature of the treatment the decedent could have undergone had the diagnosis been correct and the probability that such treatment would have extended the decedent's life.

For example, in Hadeed, the defendant physicians were charged with negligently failing to timely diagnose and treat a decedent's coronary artery disease. According to the evidence, treatment in the form of medication or bypass surgery would have improved the decedent's chance of survival. There, we said: "Likewise, proximate cause was a jury question. [The plaintiff]

presented evidence that the doctors' failure to meet the applicable standard of care destroyed any substantial possibility of [the deceased's] survival. A jury reasonably could find that with bypass surgery [the deceased] would have had an 85-90 percent chance of living to age 70. With only medical therapy, he would have had a 50 percent chance of living to age 60." 237 Va. at 286-87, 377 S.E.2d at 594.

Likewise, in Brown we stated: "Prompt diagnosis of the presence of the clot, which existed at least 48 hours before the death, would have enabled the orthopedist to administer treatment in the form of medication which would have substantially increased the patient's chances of living, according to the testimony. This was evidence of proximate cause." 229 Va. at 533, 331 S.E.2d at 446.

Consequently, we hold that the trial court did not err in granting Dr. Burt's motion to strike the plaintiff's evidence.

Second, we shall address the case against Dr. Maybach. The essence of the plaintiff's criticism of Maybach is that he mismanaged the decedent's care prior to December 13, that he should have communicated more of the patient's history to Burt, and that the handling of the two telephone calls on the 14th by Maybach's office staff was improper.

Even if we assume for purposes of this discussion that one or more of those charges somehow support a finding of negligence, nevertheless Maybach's alleged deviations from the standard of

care were too remote as a matter of law to be causally related to the decedent's death. Maybach never was afforded the opportunity to see, diagnose, or treat the decedent on the 13th. He was never asked to evaluate her complaints of pain on that day. Actually, the evidence showed he was working at a Front Royal hospital at the time. He was never asked to read the x-rays which the plaintiff now argues showed free air in the abdomen indicating a perforated ulcer.

The evidence shows that Maybach's only involvement with the decedent on the 13th consisted of two telephone calls. In the first call, he directed the patient to seek treatment at the Fauquier Hospital because he was on duty in the Front Royal hospital at the time. In the second call, Burt merely advised Maybach that the patient had been seen, evaluated, and discharged with a diagnosis of constipation.

When the telephone calls of the 14th were received, Maybach was not in his office. The decedent's daughter was told, according to the evidence, that if the patient's pain was severe she should be brought to Maybach's office or returned to the hospital. The daughter responded the family did not want to take the patient back to the hospital. The daughter was asked if she wished to leave a message for Maybach, and she declined to do so. The patient never came to Maybach's office for treatment on the 14th.

In sum, as Maybach argues, his involvement with the decedent

at the pertinent times "was simply too limited, too remote and too indirect" to be causally connected to her death. Thus, we hold the trial court did not err in granting Dr. Maybach's motion to strike.

Finally, we reject the plaintiff's other assignments of error. The trial court did not abuse its discretion in refusing to allow the deposition testimony of a radiologist as part of the plaintiff's case-in-chief. The focus of that area of inquiry was upon what an emergency room physician should have seen and evaluated on x-rays, not what an expert radiologist should have seen and evaluated. And, the trial court properly excluded proof of medical expenses that had not been linked causally to any alleged malpractice of the defendants.

For these reasons, the judgment below in favor of the defendants will be

Affirmed.