COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Chaney and Callins
Argued at Alexandria, Virginia


LOUDOUN EYE CARE, P.C., ET AL.

|   |   |   |
|---|---|---|
| | | OPINION BY |
| v. | Record No. 0217-25-4 | JUDGE DOMINIQUE A. CALLINS |
| | | FEBRUARY 10, 2026 |

MICHAEL BARTIN


FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Douglas L. Fleming, Jr., Judge

W. Thomas Chappell (F. Nash Bilisoly, IV; Tracy Taylor
Hague; Woods Rogers Vandeventer Black PLC, on briefs), for
appellants.

Brien A. Roche (Johnson & Roche, on brief), for appellee.


Loudoun Eye Care and Dr. Gitanjali Baveja (collectively, LEC) appeal the trial court's

judgment for Michael Bartin on his medical malpractice claim.  Bartin alleged LEC negligently

harmed him by failing to refer him to a retinal specialist following cataract surgery, resulting in

his monocular vision and partial blindness.  On appeal, LEC argues the trial court erred in

holding Bartin's evidence sufficient as a matter of law despite Bartin's failure to present expert

testimony on the standard of care applicable to a physician upon referral[1] in a failure-to-refer

case.  We agree, reverse, and enter final judgment.

## BACKGROUND

In November 2019, Bartin "saw a flash" when he moved his "head really fast,"

prompting him to consult an eye doctor.  Concerned, Bartin consulted Dr. George Char, an

_____

[1] We use the phrase "physician upon referral" to mean the physician to whom a patient is
referred by an alleged tortfeasor.

ophthalmologist and the owner of Loudoun Eye Care. Despite his family history of age-related macular degeneration and glaucoma, Bartin did not present with either of these conditions but had a "floater" in his eye and subpar vision. He also presented with high eye pressure, although within the normal range. During an examination, Dr. Char noted that Bartin had cataracts in both eyes and recommended that Bartin have one removed after addressing his floater. Dr. Char also identified posterior vitreous detachment in Bartin's right eye, correlating with the presence of a floater in that eye.

As a result, Dr. Char referred Bartin to a retinal specialist,[2] Dr. Mohammed Barazi, since he had "the expertise in the retina" to investigate whether Bartin had other "holes or tears" in his retina. Bartin visited Dr. Barazi three times: November 21 and 23, and December 5, 2019. Dr. Barazi dilated Bartin's pupils during each visit and used a scleral depressor to examine Bartin's retinas. Dr. Barazi identified no problems with Bartin's retinas at that time and reported his vision, optic nerve, and pressure as being normal. By December 5, Dr. Barazi concluded Bartin's posterior vitreous detachment had resolved.

Based on these observations, Dr. Barazi cleared Bartin for cataract surgery and referred him back to Dr. Char's office. Dr. Baveja, a surgical ophthalmologist, handled Bartin's case. In January 2020, Dr. Baveja consulted with Bartin regarding the risks presented by his posterior vitreous detachment, regardless of whether it had resolved. Dr. Baveja operated on Bartin's eye thereafter on March 5, 2020. After sedating Bartin, Dr. Baveja scored his lens with a laser into "six pieces like a pie" to create an entry point into Bartin's eye. From there, Dr. Baveja began removing the scored pieces of the lens, only to discover a small tear in the posterior capsule of Bartin's eye. Dr. Baveja left pieces of the "cortex" in Bartin's eye to avoid expanding the tear

---

[2] A retinal specialist is also referred to as a posterior segment ophthalmologist, as opposed to an anterior segment ophthalmologist, to which the broad term "ophthalmologist" colloquially refers.

and to ensure she would be able to implant a new lens. Dr. Baveja opted not to refer Bartin to a retinal specialist after identifying the tear, however, because she felt she could adequately monitor Bartin's eye.

Dr. Baveja met with Bartin multiple times after his surgery. The day immediately following the surgery, Bartin's optic nerve was healthy, and Dr. Baveja had a clear view of Bartin's retina. Although she had witnessed a tear in the posterior capsule less than 24 hours prior, Dr. Baveja did not identify retinal concerns during this first follow-up. She also found untroubling the fact that Bartin's eye pressure nearly tripled in the same timeframe. His vision had dramatically depreciated to 20/200 from 20/50, and he suffered from a diffused microcystic edema, described as a swelling of the cornea characterized by a hazy fluid. Her post-operative clinical plan involved treating Bartin's inflammation, monitoring his eye, and sending him back to the retinal specialist after two weeks; she told Bartin "to use his medications, not rub his eye, and to call [LEC] if there would be any . . . changes in his vision."

Dr. Baveja prescribed a medication to control Bartin's eye pressure, but it remained elevated in subsequent post-operative visits. On March 7, Dr. Baveja declined to dilate Bartin's eye and examine his retina and still did not refer him to a retinal specialist. On March 9, Bartin complained that his vision had worsened in the mornings since his last visit, but Dr. Baveja nonetheless decreased Bartin's dosage of the eye pressure medication. By March 13, Bartin's eye pressure spiked significantly. Yet Dr. Baveja declined to refer him to a retinal specialist at that point, continuing to believe Bartin showed no symptoms of a retinal tear or a posterior vitreous detachment.

Bartin did not return to Dr. Barazi until March 16 for a previously scheduled appointment. Bartin reported having floaters and experiencing pain, light sensitivity, and blurred vision. After dilating Bartin's eyes, Dr. Barazi immediately identified cortical material in the

back of Bartin's eye. Worse, Dr. Barazi identified a retinal detachment in the eye. Dr. Barazi asked Bartin to look at a white wall, and when Bartin reported he saw "black streaks running down the wall and big black dots," Dr. Barazi informed him that "that's blood" and that he had "a torn retina and [was] bleeding inside [his] eye."

Upon discovering the retinal detachment, Dr. Barazi recognized he needed to work quickly, since "the longer that [a retina] remains detached, the more detachment may occur." Dr. Barazi arranged for Bartin to undergo surgery within 24 hours with Dr. Gordon Byrnes, his partner, to mitigate further loss of Bartin's vision. The next day, Dr. Byrnes conducted a vitrectomy: he removed the gelatinous fluid in the back of the eye to cauterize the detached retina. In a follow-up visit, Dr. Barazi observed that Bartin's eye pressure decreased and that the retina had been properly reattached. In the months following, however, a membrane began forming over Bartin's retina, requiring further surgical intervention. Ultimately, Bartin's optic nerve sustained damage, and he developed post-operative glaucoma. He permanently lost "somewhere around 85 percent" of his vision.

Bartin sued LEC for medical malpractice in March 2022, and the trial court held a five-day jury trial and received testimony and exhibits outlining the facts as presented above. When Bartin called Dr. Jonathan Etter as an expert in ophthalmology and cataract surgery, LEC objected to his testimony for lack of foundation. During voir dire, Dr. Etter conceded (1) he was not a retinal specialist, (2) retinal specialists undergo two years of additional training, and (3) retinal specialists use equipment and diagnostics which he was not competent to use. Based on these concessions, LEC argued that the court should bar Dr. Etter from opining on the standard of care applicable to retinal specialists, since he "doesn't have the qualification to give that opinion." The court accepted Dr. Etter as an expert and allowed him to testify as to the standard applicable to retinal specialists, although it noted that it did not "think he [was] a retina

specialist." Because Dr. Etter "interact[ed] with retina specialist[s], and he ha[d] to in order to do his job," the trial court concluded any discrepancies about his qualifications to opine on what a retinal specialist would do upon referral would be an issue of weight for the jury to consider.

Dr. Etter opined that excessive eye pressure can "induce damage to the nerve structure in a process that [ophthalmologists] call glaucoma damage." He also explained that if a part of the lens or cortex falls into the vitreous of the eye during cataract surgery, removal of the debris is risky. The vitreous of the eye is a "very sticky" mass, so attempting to remove debris risks pulling on and tearing the retina insofar as the vitreous is connected to the retina. Debris also, however, can lead to inflammation in the vitreous if left unresolved, resulting in increased pressure on the optic nerve. By attempting to haphazardly remove the debris from Bartin's eye, and then failing to remove it at all, Dr. Etter opined that Dr. Baveja stimulated inflammation, eye pressure, and the possibility for a retinal tear in Bartin's eye. Dr. Etter explained that the standard of care would have been for Dr. Baveja to refer Bartin to a retinal specialist on March 6, the day after his surgery. And, over LEC's objections, Dr. Etter opined that a retinal specialist would have seen Bartin the same day and would have (1) "set [Bartin] up to have urgent surgery to remove . . . the lens material," and (2) "closely observed [Bartin], and with very close follow-up."

Following the close of all the evidence, the jury returned a verdict for Bartin and against LEC for $1,500,000 with pre- and post-judgment interest at 8% per annum. Post-trial, LEC moved to set aside the jury's verdict. LEC argued Bartin's claim failed as a matter of law since Bartin failed to present expert testimony establishing the standard of care applicable to a retinal specialist upon referral. The trial court denied LEC's motion. This appeal followed.

ANALYSIS

LEC argues Bartin's malpractice claim is insufficient as a matter of law for want of testimony about the standard of care applicable to a retinal specialist upon referral by an ophthalmologist. We agree.

When reviewing a trial court's refusal to set aside a jury verdict, we consider whether the verdict is plainly wrong or without evidentiary support, viewing the facts in the light most favorable to the prevailing party. *Ferguson Enters., Inc. v. F.H. Furr Plumbing, Heating & Air Conditioning, Inc.*, 297 Va. 539, 547-48 (2019). In presuming the correctness of the trial court's judgment, we are "obligated, even, to draw from the bottom of the evidentiary well—shallow though it may run—*any* evidence supporting a trial court's conclusion." *Reed v. Commonwealth*, 85 Va. App. 196, 217 (2025).

In a successful medical malpractice claim, a claimant must establish three elements: (1) the standard of care applicable to the alleged tortfeasor; (2) that the tortfeasor breached the standard of care; and (3) that the breach was the proximate cause of claimed damages. *Bitar v. Rahman*, 272 Va. 130, 137-38 (2006). "[E]xpert testimony is ordinarily necessary to establish the appropriate standard of care, to establish a deviation from the standard, and to establish that such a deviation was the proximate cause of the claimed damages." *Perdieu v. Blackstone Fam. Prac. Ctr.*, 264 Va. 408, 420 (2002) (quoting *Raines v. Lutz*, 231 Va. 110, 113 (1986)). Proximate causation requires a showing that the claimant's injury would not have occurred but-for the tortfeasor's negligence ("causation-in-fact") and that the resulting injury is foreseeable ("causation-in-law"). *See Pergolizzi v. Bowman*, 76 Va. App. 310, 339 (2022).

LEC's appeal presents a novel question about the character of evidence required in failure-to-refer cases regarding the actions that would be taken by the physician upon referral. Our Supreme Court has held a claimant fails to present sufficient evidence to prove causation

where they fail to present testimony "to establish the nature of the treatment the decedent *could* have undergone" upon timely referral. *Dixon v. Sublett*, 295 Va. 60, 68 (2018) (emphasis added) (quoting *Bryan v. Burt*, 254 Va. 28, 35 (1997)). In *Dixon*, a claimant alleged her obstetrician and gynecologist (OB/GYN) perforated her small bowel during a laparoscopic total hysterectomy. *Id.* at 63. Although the claimant presented to the OB/GYN with symptoms consistent with a bowel injury, the injury was not diagnosed until two days after the hysterectomy, thus requiring intervention by a general surgeon. *Id.* at 63. At trial, the general surgeon testified as to her personal knowledge of the surgical intervention, but not as an expert on the standard of care applicable to a surgeon upon referral. *Id.* The claimant also introduced expert testimony about the standard of care applicable to an OB/GYN, but the trial court barred that expert from testifying about what a general surgeon would do upon referral. *Id.* at 63-64.

As our Supreme Court held, fatal to the claimant's action was her failure "to present any testimony *from an expert witness* to identify what a general surgeon would have done" upon immediate referral, or how an immediate referral could have changed the outcome. *Id.* at 67 (emphasis added). With no expert testimony, the Court could not know (a) "the details of the care a general surgeon would have provided" if the perforated bowel was identified earlier, (b) that the "repair would have been performed immediately" upon discovery and prompt referral, (c) that the repair could have been less invasive than an open surgery, (d) the effects of the difference in care the claimant would have received on her health, and (e) that an immediate referral would have diminished the negative consequences of the perforation. *Id.* at 68. In emphasizing the insufficiency of the record, our Supreme Court underscored the need for expert testimony to clarify how a failure to refer could proximately cause a claimant's damages. *Id.* Yet the Court made no comment on whether the expert testimony *must* come from an expert in

the field of the physician upon referral, or whether the testimony must relate to the standard of care applicable to that physician.

Two years later, the Court clarified the fundamental components of sufficient evidence to establish causation. *Tahboub v. Thiagarajah*, 298 Va. 366, 377 (2020). In *Tahboub*, the claimant's decedent died after the physician ignored her complaints of significant pain in the days following a cervical cerclage placement. *Id.* at 369-70. Expert testimony established "what the standard of care required" and "stated how those actions would have affected" the decedent's outcomes. *Id.* at 377. The Court held that this testimony "satisfied the requirements in *Dixon* because it specifically identified what the [physicians] should have done" that "would have led to prompt diagnosis and treatment of the otherwise fatal condition." *Id.*

We conclude that *Dixon* logically extends to require, for purposes of causation, presentation of expert testimony to establish the standard of care applicable to a physician upon referral. The *Dixon* Court, relying on *Bryan*, required presentation of "testimony to establish the nature of the treatment the [claimant] could have undergone had the diagnosis been correct," as well as to establish "the probability that such treatment" would have ameliorated the claimant's condition. 295 Va. at 68 (quoting *Bryan*, 254 Va. at 35). Determining the nature of the treatment the claimant could have undergone inherently requires consideration of the applicable standard of care upon referral, defined as the "degree of skill and diligence practiced by a reasonably prudent practitioner *in the field of practice or specialty*." Code § 8.01-581.20(A) (emphasis added). Put simply, mooring *Dixon*'s "nature of the treatment" prong to the standard of care controls the quality of the evidence used to establish causation in failure-to-refer cases. *Cf. Lee v. Illinois*, 476 U.S. 530, 543 (1986) (discussing how rules of hearsay and the Confrontation Clause uphold standards of reliability). And since an expert must be qualified "by knowledge, skill, experience, training, or education," the standard of care applicable to the

- 8 -

physician upon referral ordinarily will need to be established by an expert in that physician's field, rather than by an expert in the field of the alleged tortfeasor. Va. R. Evid. 2:702(a)(i).

Here, the trial court erred in holding that the evidence was sufficient to sustain the jury's verdict. Given that no expert testified to establish the standard of care applicable to a retinal specialist upon referral, the evidence was insufficient as a matter of law to establish causation-in-law. The record contains Dr. Barazi's testimony about the actions he took once Bartin was referred to him. But, just as in *Dixon*, the record fails to clarify (1) what courses of treatment a retinal specialist could have taken upon sooner referral, (2) whether any treatment options could have diminished the long-term damages incurred by Bartin, and (3) whether and how the treatment a retinal specialist would have offered would have differed if Bartin had been referred sooner. 295 Va. at 67-68. Likewise, the trial court noted it did not "think [Dr. Etter] [was] a retina specialist." Combined with the fact that Dr. Etter conceded he was not a retinal specialist and lacked the requisite training and experience to practice as one, his testimony is inadequate to support Bartin's claim. Without evidence "to establish the nature of the treatment [Bartin] could have undergone" had he been referred sooner and "the probability that such treatment would have" prevented Bartin's damages, Bartin's evidence was insufficient as a matter of law. *Id.* at 68 (quoting *Bryan*, 254 Va. at 35).[3]

---

[3] We are obligated to decide cases "on the best and narrowest grounds available." *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). By holding the trial court erred in denying LEC's motion to set aside the verdict, we obviate the need to consider LEC's challenge to the trial court's denial of its motion for summary judgment.

CONCLUSION[4]

For the foregoing reasons, we reverse the trial court's judgment and enter final judgment for LEC. *See* Code § 8.01-681 ("The appellate court shall . . . reverse [the judgment], in whole or in part, if erroneous, and enter such judgment as to the court shall seem right and proper and shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice.").

*Reversed and final judgment.*

---

[4] LEC also argues that the trial court erred in permitting Dr. Etter, a general ophthalmologist, to testify as to what a retinal specialist would have done if Bartin had been referred to one by LEC. LEC objected to Dr. Etter's designation, arguing that he was "not qualified to testify to what a retinal specialist would have done." And LEC objected to his testimony at trial since Dr. Etter conceded that he didn't "have the qualification[s] to give" an opinion on the standard of care applicable to retinal specialists. Despite this, however, LEC designated Dr. Thomas Clinch as a board-certified ophthalmologist to testify to "what steps retina specialists . . . take when treating referred patients." Though Dr. Clinch, like Dr. Etter, lacked the requisite two-year fellowship to qualify as a retinal specialist, LEC still asked Dr. Clinch what a "reasonable retinal specialist [would] have done if they had seen" Bartin. By introducing "evidence of the same character" as Dr. Etter's testimony to which they objected, LEC has barred this Court from reversing on this issue. *Saunders v. Commonwealth*, 211 Va. 399, 401 (1970).